**NAVAJO NATION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 00–5086.

United States Court of Appeals, Federal Circuit.

Aug. 10, 2001.

Paul E. Frye, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Enfield, LLP, of Albuquerque, New Mexico, argued for plaintiff-appellant. Of counsel on the brief was Daniel I.S.J. Rey–Bear, Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., of Albuquerque, NM.

Todd S. Aagaard, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were R. Anthony Rogers, of Washington, DC, and Kristine S. Tardiff, of Concord, New Hampshire, Attorneys. Of counsel was Elizabeth Ann Peterson, Attorney, of Washington, DC.

Peter Buscemi, Morgan, Lewis & Bockius LLP, of Washington, DC, for amici curiae Peabody Holding Company, Inc., et al. With him on the brief was Brad Fagg.

Before NEWMAN, SCHALL, and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge PAULINE NEWMAN.
Concurring in part and dissenting in part opinion filed by Circuit Judge SCHALL.

PAULINE NEWMAN, Circuit Judge.

The Navajo Nation appeals the decision of the United States Court of Federal Claims, dismissing its complaint against the United States for breach of trust and breach of contract.[1] The court ruled that although the United States had breached its fiduciary obligations to the Navajo Nation, this breach was not actionable because the United States did not have a trust relationship with the Navajo Nation and monetary relief was not available. However, a trust relationship indeed existed and exists with the Navajo Nation, and monetary damages are an available remedy for breach of this trust.

## BACKGROUND

The United States, through the Secretary of the Interior and the Interior Department's Bureau of Indian Affairs (BIA), supervises and regulates the development and sale of mineral resources on Indian reservation lands, pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396 *et seq.*, the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101–2108, and implementing regulations.

In 1964 the Navajo Nation entered into a lease agreement with the Sentry Royalty Company (predecessor in interest to the Peabody Coal Company) for the mining of coal deposits on Navajo lands. The agreement provided for payment of a royalty not to exceed 37.5 cents per ton, and authorized the Secretary of the Interior or his delegate to readjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. As that anniversary approached, due to increases in the market price of coal the rate of 37.5 cents per ton was equivalent to about 2% of gross proceeds. It is not disputed that this was well below then-prevailing royalty rates.

Negotiations proceeded between the Navajo and Peabody. No agreement was

1. *Navajo Nation v. United States,* 46 Fed. Cl. 217 (2000).

reached, and the Navajo asked the Department of the Interior to resolve the issue, in accordance with statute, and to set the royalty at a fair market rate. The BIA Area Real Property Management Officer issued an Initial Decision to increase the royalty rate to 20%, based on an analysis by the Bureau of Mines. The BIA's Navajo Area Director adopted this decision, and so notified Peabody. Peabody appealed to the Deputy Assistant Secretary for Indian Affairs John Fritz, acting as both Commissioner of Indian Affairs and the Assistant Secretary of Indian Affairs, an appellate path provided by the regulations. *See* 25 C.F.R. §§ 211.2, 211.3. The Deputy Assistant Secretary for Indian Affairs considered the matter and reached a decision affirming the 20% rate. However, this decision was withdrawn at the instruction of the Secretary of the Interior. The Appendix to the decision of the Court of Federal Claims contains a memorandum from Secretary Hodel to John Fritz, Deputy Assistant Secretary for Indian Affairs, stating "I suggest that you inform the involved parties that a decision on this appeal is not imminent and urge them to continue with efforts to resolve this matter in a mutually agreeable fashion." 46 Fed. Cl. at 237. Mr. Fritz complied with this instruction.

The record before the Court of Federal Claims reports numerous contacts during this period, on behalf of Peabody, with Interior officials including the Secretary. The Navajo were not told that a decision on Peabody's appeal had been made in their favor. Facing severe economic pressures, the Navajo eventually agreed to a royalty rate of 12.5%.

It can not be reasonably disputed that the Secretary's actions were in Peabody's interest and contrary to the Navajo's interest. The Court of Federal Claims found that the government's actions "violated the most fundamental fiduciary duties of care, loyalty and candor." 46 Fed. Cl. at 227. However, the court also held that there was no trust relationship between the agency and the Navajo with respect to these events, and thus that no monetary relief was available.

## DISCUSSION

### *The Fiduciary Relationship*

■ The legal relationship between the United States and the Indian tribes takes a variety of forms, and in part is that of a fiduciary and its charge. *See, e.g., United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973) ("There is no doubt that the United States serves in a fiduciary capacity with respect to these Indians and that, as such, it is duty bound to exercise great care in administering its trust."); *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) ("this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people"); *United States v. Shoshone Tribe*, 304 U.S. 111, 117–118, 58 S.Ct. 794, 82 L.Ed. 1213 (1938) ("As transactions between a guardian and his wards are to be construed favorably to the latter, doubts, if there were any, as to ownership of lands, minerals, or timber would be resolved in favor of the tribe.")

■ The fiduciary relationship between the United States and the Indian tribes is manifested in various ways. For example, with respect to Indian reservation lands, precedent recognizes a distinction between the laws whereby the United States has only a limited trust relationship with the

Indian tribes who occupy the land, and the laws giving rise to a full fiduciary duty toward the Indians. The difference lies in the level of control the United States exercises in its management of the land and its resources for the benefit of the Indians. When the United States controls the Indian resources, the duty is that of a fiduciary; when the Indians control their own resources, the duty of the United States is lessened appropriately.

These relationships and duties were discussed in *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*) and 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*). The Court explained that when the United States is assigned control of the management of Indian resources and the duty to manage those resources, there is created a full fiduciary relationship with respect to that management, including all appurtenant trustee duties, obligations, and liabilities. In *Mitchell I* the Court explained that the United States' role of trustee holding title to reservation land under the General Allotment Act is simply an expedient to avoid state and local burdens, whereas the role of the United States in management of the resources of the land is as a full fiduciary, *see Mitchell II,* implementing the government's statutory obligation to manage these resources entirely for the benefit of the Indians. Thus the Court distinguished the government's holding of "bare trust" title to an Indian land allotment without responsibility to manage the resources thereof, from the government's control and management responsibility of these resources as a fiduciary:

> In contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

*Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961.

This guidance has frequently been applied. In *Brown v. United States,* 86 F.3d 1554 (Fed.Cir.1996) the issue concerned the commercial leasing of land that had been allotted to Indians. The court explained that the test of the government's fiduciary responsibility is whether "the Secretary, rather than the allottees, has control or supervision over the leasing program." *Id.* at 1561. The court observed that a full fiduciary duty exists even when the government has less than total control of management of the resources, and that participation by the Indians in resource management does not absolve the United States of its responsibility to act in the sole and best interests of the Indians.

In *White Mountain Apache Tribe v. United States,* 249 F.3d 1364 (Fed.Cir. 2001), the statute establishing "an enforceable fiduciary relationship between the United States and the Tribe," *id.* at 1383, provided that Fort Apache, which had been a military facility within what later became the Tribe's reservation in Arizona, be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." This court held that the statute established a full fiduciary relationship. Although the statute was silent on how the United States was to administer the property, the court applied the com-

mon law of trusts to hold that the United States had a trustee's duty to preserve the trust corpus, despite the absence of a specific statute and regulations. This court stated:

> Although neither the 1960 Act nor any pertinent regulation sets forth clear guidelines as to how the government must manage the trust property, we think it is reasonable to infer that the government's use of any part of the property requires the government to act in accordance with the duties of a common law trustee.

*White Mountain,* 249 F.3d at 1377.

In *Confederated Tribes of the Warm Springs Reservation v. United States,* 248 F.3d 1365, 1371 (Fed.Cir.2001), the fiduciary breach arose from the government's mismanagement of Indian timber resources. Since the United States exercised "comprehensive control over the management and harvesting of timber on Indian reservations," the statutes and regulations established a fiduciary duty in the government to manage the resources in the interest of the Tribes. The court looked to the common law of trusts to determine the measure of damages for the government's breach of this duty, stating:

> Under trust law generally, a beneficiary is entitled to recover damages for the improper management of the trust's investment assets. In determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach.

248 F.3d at 1371. The court recognized its obligation, upon breach of trust, to resolve any uncertainty in the measurement of damages against the trustee. *See id.* ("It is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee.")

In *Pawnee v. United States,* 830 F.2d 187, 190 (Fed.Cir.1987) this court held that statutes giving the Department of the Interior power and authority with respect to oil and gas leases on Native American lands imposed fiduciary obligations upon the government and provided a remedy of money damages in the Claims Court for their breach.

■ The Indian Mineral Leasing Act and its regulations are similar to those governing timber resources that were the subject of *Mitchell II,* insofar as federal authority is retained. The Mineral Leasing Act starts with the provision that no mining lease may be entered unless approved by the Secretary of the Interior:

> **25 U.S.C. § 396a.** On and after May 11, 1938, unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those specifically excepted from the provisions of sections 396a to 396g of this title, may, *with the approval of the Secretary of the Interior,* be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

(Emphasis added.) The statute and its implementing regulations give the Secretary the final authority on all matters of any significance in the leasing of Indian lands for mineral development. The statute assigns to the Secretary the broad and

unqualified obligation to "protect[ ] the interests of the Indians," and includes the power to "perform any and all acts and to make such rules and regulations not inconsistent with this section as may be necessary and proper for the protection of the interests of the Indians and for the purpose of carrying the provisions of this section into full force and effect." 25 U.S.C. § 399. Thus the statute explicitly requires that the Secretary must act in the best interests of the Indian tribes.

Throughout the statute and its implementing regulations is seen the pervasive control by the United States of the manner in which mineral leases are sought, negotiated, conditioned, and paid, and the pervasive obligation to protect the interests of the Indian tribes. For example, the regulations require the written permission of the Commissioner of Indian Affairs before a Tribe can enter into negotiations for a lease rather than offer the lease in an advertised sale. 25 C.F.R. § 211.2. The regulations state the amount of bond to be secured, 25 C.F.R. § 211.6, and authorize a reduced bond if "the circumstances warrant and the interests of the Indian landowners are fully protected," 25 C.F.R. § 211.6(a). The regulations set forth the corporate information to be furnished to the appropriate officer of the Bureau of Indian Affairs, and state the officer's power to require other information. 25 C.F.R. § 211.7. The regulations control the size of coal leases by limiting them, with certain exceptions, to 2,560 acres, 25 C.F.R. § 211.9; and permit the Secretary to approve leases in excess of the acreage limitations if such approval "is in the interest of the lessor." § 211.9(b)(1). The regulations state that the shape of the leased area must be reasonably compact and conform to the system of public land surveys. 25 C.F.R. § 211.8. The regulations pre-

scribe the term of mineral leases and the conditions of their extension. 25 C.F.R. § 211.10.

The regulations provide that royalties earned under such leases must be deposited in the Treasury "to the credit of the Indians belonging and having tribal rights on the reservation where the leased land is located." 25 U.S.C. § 399. Royalties are paid to the superintendent "for the benefit of the lessors." 25 C.F.R. § 211.12(a). The regulations set the minimum royalties for various minerals. 25 C.F.R. § 211.15. The regulations require that no mining operations shall begin until the lease is approved by the Secretary of the Interior, and must be conducted "in accordance with the operating regulations promulgated by the Secretary of the Interior." 25 C.F.R. § 211.20. The Secretary may cancel a lease for any violation of the lease terms or regulations, and may do so without the consent of the Indian lessors. 25 C.F.R. § 211.27.

It is quite clear that the statute and regulations assign to the Secretary of the Interior and other government officials the authorization, supervision, and control of Indian mineral leasing activities. The statute and regulations leave no significant authority in the hands of the Indian tribes whose reservation land contains the minerals, and all procedures, responsibilities, and even details are prescribed by Act of Congress and in the regulations promulgated by the Secretary of the Interior. The statutory purpose is to protect the natural resources of the Indians and manage them in a manner that maximizes their benefit to the Indians. The Court has consistently resolved ambiguity in favor of the Indian tribes. For example, in *Montana v. Blackfeet Tribe*, 471 U.S. 759, 767 n. 5, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)

the Court noted that state taxation of royalty interests would frustrate the IMLA's purpose of "ensur[ing] that Indians receive 'the greatest return from their property,'" quoting the legislative history of the IMLA.

The Indian Mineral Leasing Act's history elaborates upon the fiduciary relationship. When the Act was proposed, the Secretary of the Interior urged that the legislation be enacted because "it is not believed that the present law is adequate to give the Indians the greatest return from their property." Senate Report No. 985 at 2 (1937); House Report No. 1872 at 2 (1938). Congress responded to the need to ensure that the Indians' welfare is protected and their natural resources managed to the tribes' maximum benefit by emphasizing the Secretary's fiduciary obligations. For example, the legislative reports explained that now the Secretary would approve mineral leases only when they are "in the interest of the Indians." *Id.* Statute, regulations, and precedent place on the federal official a clear and unqualified fiduciary responsibility to manage the mineral resources for the benefit of the Indians. The Court of Federal Claims erred in holding that there was no authorization for a trust relationship between the United States and the Navajo Nation as to the coal resources.

### Breach of the Fiduciary Relationship

 The action of the Secretary in suppressing and concealing the decision of the Deputy Assistant Secretary for Indian Affairs, thereby favoring Peabody interests to the detriment of Navajo interests, was characterized by the Court of Federal Claims as "violat[ing] the most basic common law fiduciary duties owned to the Navajo Nation." 46 Fed. Cl. at 219. As that court explained:

Let there be no mistake. Notwithstanding the formal outcome of this decision, we find that the Secretary has indeed breached these basic fiduciary duties. There is no plausible defense for a fiduciary to meet secretly with parties having interests adverse to those of the trust beneficiary, adopt the third parties' desired course of action in lieu of action favorable to the beneficiary, and then mislead the beneficiary concerning these events. Even under the most generous interpretation of the series of events leading up to the approval in December 1987 of the renegotiated lease package, the Secretary of Interior violated his common law fiduciary responsibilities.

46 Fed. Cl. at 226. In addition to violation of common law fiduciary duties, the Secretary also violated statutory fiduciary duties, in acting to benefit Peabody to the detriment of the Navajo. By suppressing the royalty decision of Interior's Deputy Assistant Secretary for Indian Affairs, the Secretary acted in direct contravention of the Act's charge to the Secretary to obtain for the Indians the maximum return for their minerals. In failing to act in the best interests of the Navajo, the government violated its fiduciary responsibilities. Although the government argued, at the hearing of this appeal, that the Secretary's actions were justified in that they reflected a balance of national interests, it is hornbook law that a trustee's competing interests do not excuse a breach of fiduciary duty.

 Breach by the federal government of its fiduciary duty is subject to remedy by the assessment of "damages resulting from a breach of the trust," as confirmed in *Mitchell II* :

This Court and several other federal courts have consistently recognized that

the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust. 463 U.S. at 226, 103 S.Ct. 2961. The Court confirmed that "The Court of Claims therefore has jurisdiction over respondents' claims for alleged breaches of trust." *Id.* at 228, 103 S.Ct. 2961. The Court of Federal Claims erred in holding that it was without jurisdiction to grant monetary relief and improperly dismissed the complaint.

### Conclusion

The United States breached its fiduciary obligations to the Navajo Nation in connection with these coal leases with Peabody. A claim for damages for that breach is within the jurisdiction of the Court of Federal Claims. The dismissal is reversed, and the case is remanded for further proceedings including determination of damages.

### REVERSED AND REMANDED

SCHALL, Circuit Judge, concurring-in-part and dissenting-in-part.

The Tucker Act and the Indian Tucker Act establish the jurisdiction of the United States Court of Federal Claims over certain claims against the government and constitute a waiver of sovereign immunity as to those claims. 28 U.S.C. §§ 1491, 1505 (1994). However, those statutes, by themselves, do not create "any substantive right enforceable against the United States for money damages." *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*") (citing *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*") (discussing the Tucker Act and Indian Tucker Act)). For a claimant to state a claim upon which relief can be granted, a substantive right for money damages "must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'" *Mitchell II,* 463 at 216, 100 S.Ct. 1349 (quoting 28 U.S.C. § 1491). In this case, the Navajo Nation ("Nation") asserts a claim for money damages against the government based upon alleged breaches of the government's trust obligations to the Nation.

### I.

The Supreme Court, in *Mitchell I,* addressed the issue of under what circumstances fiduciary obligations are created and breached so as to establish a claim for money damages contemplated by the Tucker Act and Indian Tucker Act. In *Mitchell I,* the Quinault Tribe alleged, under a breach of trust theory, that it was entitled to recover money damages in the United States Court of Claims, one of our predecessor courts, for the government's mismanagement of its timber resources. 445 U.S. at 537, 100 S.Ct. 1349. The Tribe alleged that a trust was established by the General Allotment Act of 1887 (codified at 25 U.S.C. § 331 *et seq.*). However, the Court held that the Act "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the [g]overnment to manage timber resources." *Id.* at 542, 100 S.Ct. 1349. The Court determined that the Act did "not unambiguously provide that the United States ha[d] taken full fiduciary responsibility as to management of allotted lands," in particular, the

management of timber resources on the allotted lands. *Id.* at 542–43, 100 S.Ct. 1349. The Court concluded that the General Allotment Act did not establish that the government had a fiduciary duty to manage the Tribe's forest lands; therefore, the Tribe's ability to recover money damages for the government's actions had to be found "in some other source than the Act." *Id.* at 546, 100 S.Ct. 1349.

The Supreme Court revisited the Quinault Tribe's claim for money damages in *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961, where the Court held that there was a fiduciary relationship between the government and the Tribe. The Court found statutes and regulations that "establish[ed] the 'comprehensive' responsibility of the [government] in managing the harvesting of Indian timber," with "[v]irtually every stage of the process ... under federal control." *Id.* at 222, 103 S.Ct. 2961 (citations omitted). From these statutes and regulations, the Court determined that "a fiduciary relationship necessarily arises when the [g]overnment assumes such elaborate control over forests and property belonging to Indians." *Id.* at 225, 103 S.Ct. 2961. The Court stated that the very statutes and regulations that create the fiduciary relationship also "define the contours of the United States' fiduciary responsibilities." *Id.* at 224, 103 S.Ct. 2961. The Court concluded that the Court of Claims had jurisdiction over the Tribe's claims that the government had violated its fiduciary obligations in management of the Tribe's timber land. *Id.* at 228, 103 S.Ct. 2961.

This court applied the Court's teachings in *Mitchell I* and *Mitchell II* in *Pawnee v. United States,* 830 F.2d 187 (Fed.Cir. 1987). In *Pawnee,* the Cheyenne–Arapaho Tribe claimed that the government had breached its fiduciary obligation to receive gas royalties computed at the highest market value for two of the Tribe's oil and gas leases. *Id.* at 188–89. In addressing this claim, we first considered whether there was "any general fiduciary relationship" between the Tribe and the government. *Id.* at 189. We found such a relationship, noting that the Indian Long–Term Leasing Act, codified at 25 U.S.C. § 396, placed the Secretary of the Interior "at the center of the leasing of Indian mineral lands." *Id.* We also pointed to certain accompanying regulations as evidence of the government's involvement in all aspects of the leasing arrangement. *Id.* at 190. We concluded, based on these statutes and regulations, "that the United States has a general fiduciary obligation toward the Indians with respect to the management of [the] oil and gas leases." *Id.*

We noted, however, that the existence of a general fiduciary relationship "does not mean that any and every claim by the Indian lessor necessarily states a proper claim for breach of the trust a claim which must be fully tried in the Claims Court." *Id.* at 191. We looked to the statutes and regulations that established the fiduciary relationship and noted that the Tribe's claim ran counter to the requirements of the governing regulations, which expressly restricted the highest price for a majority of the oil and gas produced on the leased land. *Id.* We also noted that "the fiduciary relationship springs from the statutes and regulations" that define the relationship, and that the Tribe had failed to allege the violation of any specific statute or regulation. *Id.* We concluded that, under *Mitchell II,* the focus is on the statute and regulations that create the fiduciary relationship, and that the Tribe could not create a "viable fiduciary claim purely by insisting that this court (or the Claims

Court) establish different or higher standards" than those established by law. *Id.* at 192. We therefore found that the Tribe had failed to state a proper claim for breach of trust, and affirmed the dismissal of its claim. *Id.*

We revisited *Mitchell I, Mitchell II,* and *Pawnee* in *Brown v. United States,* 86 F.3d 1554 (Fed.Cir.1996). Brown, and other Indians, alleged that the government had breached a fiduciary duty imposed by 25 U.S.C. § 415 and 25 C.F.R. part 162 [2] by failing either to compel the Indians' lessees to fulfill their reporting and payment responsibilities or to cancel the leases. *Brown,* 86 F.3d at 1557. As we did in *Pawnee,* we first looked to see if a fiduciary relationship existed between the Indians and the government with respect to the leased properties. *Id.* at 1559–61. We noted that, under *Mitchell II,* the test for determining whether there was such a relationship was whether the government "takes on or has control or supervision over the tribal monies or properties" that are at issue. *Id.* at 1560 (quoting *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961). We termed this the "control or supervision test" and noted that nearly complete government management was not necessary to create a fiduciary relationship. *Id.* at 1560–61. Applying these standards, we found that the government did control the Indians' leasing program enough to created an enforceable fiduciary duty. *Id.* at 1561–62. This established a general fiduciary duty, but we noted that the Indians still needed to allege a breach of a specific statutory requirement or regulation to sustain a money claim against the government. *Id.* at 1563. We reiterated that the statutes and regulations that create the general fiduciary relationship define the scope and extent of the fiduciary relationship. *Id.* We concluded that, on the record before us, it was not clear that the Indians had "alleged the breach of a specific duty that the regulations squarely place on the [government]." *Id.* Accordingly, we remanded the case for the trial court to determine whether the Indians "alleged the breach of a specific duty that the regulations squarely place[d] on the [government]." *Id.*

Recently, in *White Mountain Apache Tribe v. United States,* 249 F.3d 1364 (Fed. Cir.2001), we found an enforceable fiduciary relationship between the White Mountain Apache Tribe and the government whose breach could give rise to a claim for money damages. First, we determined whether there was a fiduciary relationship between the Tribe and the government regarding buildings and land at Fort Apache, which is within the borders of the Tribe's reservation in Arizona. *Id.* at 1376–77. We found such a relationship existed, based on a 1960 Act of Congress, Pub.L. No. 86–392, 74 Stat. 8 (1960), to the extent that the government controlled and used the buildings and land at Fort Apache. *Id.* at 1373–77. Then, we determined the government's obligations under this fiduciary relationship, first looking to the common law of trusts to define the nature of the government's obligations. *Id.* at 1377–80. We found that general principles of trust law required the government to use "reasonable care and skill" to preserve the buildings and lands at the

---

**2.** Section 415 provides that Indian lands may be leased by those tribes or individuals who own them with the approval of the Secretary of the Interior. 25 U.S.C. § 415. Section 415 also indicates that such leases are made under the terms and regulations established by the Secretary, which include those regulations found in 25 C.F.R. part 162. 25 U.S.C. § 415.

fort with respect to which the government had a fiduciary duty to the Tribe. *Id.* at 1379 (citations omitted). We stated: "[I]n each case, we must ... examine the particular statute, treaty, 'or other fundamental document,' that creates the trust relationship in order to determine the nature of the relationship and whether the general law of trust has been altered in any particular way, either by the imposition of additional obligations or by the modification of existing obligations." *Id.* at 1380 (citations omitted). We concluded that the Tribe had stated a proper claim for money damages, but pointed out that just because there was a general fiduciary relationship did not mean that every claim by the Tribe was meritorious. *Id.* at 1383 (citing *Pawnee*, 830 F.2d at 191).

With the legal framework established, I now turn to the facts of this case.

## II.

In 1964, the Nation entered into Lease 8580 (the "1964 Lease") with Sentry Royalty Company, the predecessor in interest of Peabody Coal Company ("Peabody"), for the mining of coal on the Nation's land at a royalty rate of not more than 37.5 cents/ton. Article VI of the 1964 Lease provides as follows:

> During the period that the land so leased is under Federal jurisdiction, the royalty provisions of this lease are subject to reasonable adjustment by the Secretary of the Interior or his authorized representative at the end of twenty years from the effective date of this lease, and at the end of each successive ten-year period thereafter. In the event of termination of Federal jurisdiction, the royalty provisions shall, in lieu of Secretarial adjustment, be subject to re-negotiation between Lessor and Lessee at the times aforesaid, provided that if the parties are unable to agree, such royalty shall be submitted to arbitration.

In 1984, after negotiations between the Nation and Peabody proved unproductive, the Nation requested, under Article VI, that the Bureau of Indian Affairs ("BIA") raise the royalty rate. BIA, which is part of the Department of the Interior ("DOI"), initially determined that the rate should be raised to 20% of the gross value of the coal mined. Peabody appealed that decision to the Commissioner of Indian Affairs in the DOI, pursuant to the procedures outlined in 25 C.F.R. part 2. Although the official handling the appeal was prepared to issue a decision affirming the 20% royalty rate, then-Secretary of the Interior Donald Hodel requested that release of the decision be delayed. Consequently, both Peabody and the Nation were informed by DOI that a decision on the appeal was not imminent and that they should try to negotiate. Unbeknownst to the Nation, prior to acting on the matter, Secretary Hodel had met with representatives of Peabody who had asked the Secretary to delay the release of DOI's decision.

Peabody and the Nation resumed negotiations, and in 1987, an agreement was reached with respect to renegotiation of the 1964 Lease (the "Agreement"). In addition to amending the lease by raising the royalty rate to 12.5%, the Agreement also addressed other matters, including confirming the Nation's ability to tax Peabody, amending two other leases by raising their royalty rates to 12.5%, adding provisions for future royalty adjustments, establishing a tribal scholarship fund, and requiring the payment by Peabody of certain back royalties, bonuses, and water payments. The Agreement was submitted

to DOI for review, and DOI formally approved the Agreement on December 14, 1987.

The Nation filed suit against the government in the Court of Federal Claims on December 14, 1993. The Nation charged that the government had breached its fiduciary duties to the Nation, based on Secretary Hodel's *ex parte* communications with Peabody, DOI's alleged failure to properly oversee negotiations between Peabody and the Nation, and DOI's final approval of the Agreement, which only raised the 1964 Lease's royalty rate to 12.5%, instead of 20%. The Nation also alleged that the government had breached contractual obligations under Article VI of the 1964 Lease by approving the Agreement. Both the government and the Nation moved for summary judgment on these claims.[3]

The Court of Federal Claims first rejected the government's contention that the Nation's claims were time-barred. *Navajo Nation v. United States,* 46 Fed. Cl. 217, 224–25 (2000). The court then discussed the Nation's breach of trust claim, first looking at the claim under general trust principles. *Id.* at 226–27. The court concluded that the government's *ex parte* communications with Peabody and its following actions during the royalty adjustment proceedings violated the "most fundamental fiduciary duties of care, loyalty and candor." *Id.* at 227. The court noted, however, that in order for the Nation to succeed on its money claim against the government, it had to show that some statute, treaty, regulation, or other source of law imposed specific fiduciary obligations on the government and that the government had violated those fiduciary obligations. *Id.* at 227–28.

The court first addressed whether the government had a general fiduciary obligation with regard to coal leases on Indian land, focusing on the amount of management and control the government assumed over such leases. *Id.* at 228. In that regard, the court considered the Indian Mineral Leasing Act of 1938, 52 Stat. 347 (1938) (codified at 25 U.S.C. §§ 396a–396g) ("IMLA"), and the accompanying regulations, 25 C.F.R. part 211 (1985). *Navajo Nation,* 46 Fed. Cl. at 228–30. The court determined that, while the level of management and control exercised by the government over oil and gas leases may be enough to establish a fiduciary obligation, the government's level of control over coal leases, and in particular coal royalties, is not enough to "rise above a generalized trust obligation." *Id.* at 231–33. In addition, the court concluded that even if a fiduciary obligation does exist, the Nation failed to "link any breach [it alleged] to a specific money-mandating statutory or regulatory provision." *Id.* at 233–34.

The court also found that the government owed no contractual obligation toward the Nation under the 1964 Lease. *Id.* at 234. The court pointed out that the government was not a party to the lease, and that no consideration had passed to the government under the 1964 Lease from either the Nation or Peabody. *Id.* at 234–35. Finally, the court dismissed the Nation's claim that there was an implied-in-fact contract between the government and the Nation with respect to the revision of the royalty rate of the 1964 Lease because there was no intent to contract by the government, no consideration to the government, and no clear offer and accep-

3. The government acknowledges that the Court of Federal Claims had jurisdiction over the Nation's claims, and that it thus was prop-

er for the court to reach the merits of those claims and entertain motions for summary judgment.

tance by the government.[4] *Id.* at 236. Based on its findings, the Court of Federal Claims granted the government's motion for summary judgment and dismissed all of the Nation's claims. *Id.*

### III.

On appeal, the Nation argues that the government has general fiduciary obligations to it with respect to coal leases involving Indian land, and that, in this case, the government breached those obligations. Specifically, the Nation asserts that IMLA requires the government to review all leases and lease amendments in order to assure that they are in the best interests of the Indians and that Indian profits are maximized. The Nation contends that the government breached this obligation by prohibiting a 20% royalty rate and approving the Agreement for a lower royalty rate of 12.5%. The Nation also contends that the government violated its general fiduciary duties of care, candor, and loyalty to the Nation by preventing the royalty rate adjustment of 20%, engaging in *ex parte* communications with Peabody, misleading the Nation into resuming negotiations with Peabody, and approving the Agreement to amend the 1964 Lease without review.

The Nation further argues that the government violated 25 U.S.C. § 396a and 25 C.F.R. § 211.2 by approving the Agreement without any economic analysis. The Nation contends that the government violated 25 C.F.R. § 211.2 by colluding with Peabody to compel further negotiations and by failing to supervise the negotiations. The Nation states that DOI, by allowing a low royalty rate in the Agreement, violated the minimum royalty rate established by 30 U.S.C. § 207(a) and the BIA Manual ("BIAM"), 54 BIAM § 604.05. According to the Nation, the government violated the DOI Manual, 130 DM 10.5, and the BIA Manual by failing to perform any economic analysis before approving the Agreement to amend the 1964 Lease. Finally, the Nation argues that the government violated Article VI of the 1964 Lease by preventing a "reasonable" royalty adjustment that was explicitly required by the Lease. The Nation concludes that these specific violations of the government's fiduciary duties entitle it to monetary damages against the United States.

The majority concludes that IMLA and the accompanying regulations, "assign to the Secretary of the Interior and other government officials the authorization, supervision, and control of Indian mineral leasing activities." Majority, op. at 1331. Based on this finding of supervision and control, the majority determines that a trust relationship is created, giving the government "a clear and unqualified fiduciary responsibility to manage the mineral resources for the benefit of the Indians." *Id.* at 1332. The majority holds that the Court of Federal Claims erred in finding no trust relationship between the government and the Nation with regard to the Nation's coal leases. *Id.* at 1332. Next, noting that the lower court found that Secretary Hodel's actions with respect to BIA's initial royalty rate decision violated common law fiduciary duties owed to the Nation, the majority concludes that the Nation has stated a claim upon which monetary relief can be granted. *Id.* at 1332.

---

**4.** The Nation does not appeal the Court of Federal Claims' dismissal of its breach of contract claims.

The majority also finds that what it characterizes as the Secretary's "suppression and concealment" of BIA's decision "acted in direct contravention of the [IMLA's] charge to the Secretary to obtain the Indians the maximum return for their minerals." *Id.* at 1332. It therefore reverses the decision of the Court of Federal Claims dismissing the complaint and remands for further proceedings. *Id.* at 1333.

I agree with the majority that IMLA and the regulations at 25 C.F.R. part 211 create a scheme under which the government plays a major role in mineral leasing on Indian land and that, therefore, there exists a general fiduciary relationship between the Nation and the government regarding coal leases, such as the 1964 Lease at issue here.

It is at this point, however, that I part company with the majority. A court first must decide whether a general fiduciary relationship exists in a particular area between Indians and the government. Then, it must determine whether, in the context of that relationship, the government has breached any specific fiduciary responsibilities. It makes this determination by considering the government conduct at issue in light of the requirements of the statutes and regulations that create the general fiduciary relationship in the first place. *See Brown,* 86 F.3d at 1563; *see also Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961 (noting that "the statutes and regulation now before us ... establish a fiduciary relationship *and* define the contours of the United States' fiduciary responsibilities." (emphasis added)); *White Mountain Apache Tribe,* 249 F.3d at 1377–80 (determining, after finding a fiduciary relationship, what the government's specific obligations are and whether the statute that

created the relationship altered the general law of trusts in any way); *Pawnee,* 830 F.2d at 191 (stating that the existence of a "general fiduciary relationship does not mean that any and every claim by the Indian lessor necessarily states a proper claim for breach of the trust"). In this case, the majority properly undertakes the first step of the analysis but not the second. After concluding that a general fiduciary relationship exists between the government and Indians with respect to the mining of coal on Indian lands, the majority, focusing exclusively on Secretary Hodel's actions relating to BIA's royalty decision, fails to properly conduct the required second step of the analysis. I believe the majority errs in two respects: first, it fails to find a breach of a specific fiduciary responsibility that falls within the scope of the statutes and regulations that establish the general fiduciary relationship; second, it only considers one aspect (Secretary Hodel's actions relating to BIA's royalty decision) of the overall government conduct that is at issue.

IV.

In my view, the only government action in this case that implicated a specific fiduciary responsibility to the Nation was DOI's approval of the Agreement. The Nation and Peabody submitted the Agreement to DOI for review. DOI indicated, in an internal report, that it was reviewing the Agreement pursuant to DOI's powers of lease approval under 25 U.S.C. § 396a and the regulations under 25 C.F.R. part 211, sources of law that establish a fiduciary relationship between the Nation and the government. Thereafter, when DOI approved the Agreement, it invoked its approval powers under 25 U.S.C. § 396a and 25 C.F.R. § 211.2, both of which subject

the leasing of mineral rights on Indian land to DOI approval.[5] The government's obligation under 25 U.S.C. § 396a and 25 C.F.R. § 211.2 is to either approve, or disapprove, a lease, or lease amendment, and since this obligation falls within "the contours of the United States' fiduciary responsibilities," *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961, the government must make its approval decision with the reasonable care and skill demanded of a trustee, *White Mountain Apache Tribe,* 249 F.3d at 1378–79. It is undisputed that, when deciding whether to approve the amendment of the 1964 Lease, DOI failed to perform any economic analysis regarding the lease amendments. In my view, this failure constituted a breach of a fiduciary obligation owed to the Nation. I believe it is reasonable to conclude that one aspect of the lease approval obligation is determining whether a proposed lease is financially beneficial for the Indians involved. *See Restatement (Second) of Trusts* § 174 (1959) (noting that a trustee is under a duty to the beneficiary to administer the trust with reasonable care and skill); *Cheyenne–Arapaho Tribes of Ok. v. United States,* 966 F.2d 583, 589–91 (10th Cir.1992) (requiring the Secretary of the Interior to consider relevant economic factors before approving a communization agreement under 25 U.S.C. § 396d of IMLA). I do not believe, however, that any of the other breaches that are alleged by the Nation implicate a fiduciary obligation on the part of the government so as to give rise to a claim for monetary damages against the United States.

Initially, the Nation alleges general violations of the common trust obligations of care, candor, and loyalty. In making this allegation, the Nation points to the *ex parte* communications between Secretary Hodel and Peabody and DOI's failure to secure a 20% royalty rate. While these duties, based on the common law of trust, are relevant to determining the government's obligations, *White Mountain Apache Tribe,* 249 F.3d at 1377–78, the scope and extent to which these obligations apply to governmental action is governed by the statutes and regulations that create the fiduciary relationship, *id.* at 1380. *See also Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961; *Brown,* 86 F.3d at 1563. The Nation must explain how DOI's actions, which may demonstrate disloyalty to the Nation in a vacuum, fall within the boundaries of a specific fiduciary obligation. That it has not done.

The Nation also alleges violations based on internal agency policy, expressed in BIA Manuals, 54 BIAM § 604.5 for example, and DOI manuals, 130 DM 10.5 for example. Neither of these manuals, or general agency policy, can support a claim for monetary damages because a substantive right to monetary relief must be found "in some ... source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'" *Mitchell II,* 463 U.S. at 216, 103 S.Ct. 2961 (citing 28 U.S.C. § 1491). The Nation fails to show how these manuals "can be fairly interpreted to create a substantive right to monetary compensation

---

**5.** The Nation also argues that 25 C.F.R. § 211.2 places upon the government the obligation of overseeing negotiations for leases and lease amendments. However, the regulation does not discuss the government supervising lease negotiations. As § 211.2 indicates, the Secretary makes a decision regarding negotiations only if (1) the Indians do not want to take bids and request a negotiation or (2) a negotiation is granted in lieu of bidding and the negotiated document is submitted to the government. Neither situation is present in this case.

from the United States," *Hamlet v. United States,* 63 F.3d 1097, 1102 (Fed.Cir.1995).

The same analysis applies to the Nation's claims based upon Article VI of the 1964 Lease and DOI's actions relating to the review of BIA's initial royalty rate decision. While the language of Article VI states that the government will, after 20 years, raise the royalty rate under the Lease to a reasonable rate, the 1964 Lease is not a document by which the government is bound. Consequently, actions under the Lease are not within the contours of the government's fiduciary relationship with the Nation. As the Court of Federal Claims correctly noted, the government was not a party to the 1964 Lease and there is no evidence of an intent by the government to assume any contractual obligations under the Lease. *Navajo Nation,* 46 Fed. Cl. at 235–36. Finally, the government's actions during the review of BIA's initial decision to raise the royalty rate to 20%, including Secretary Hodel's *ex parte* communications with Peabody and his actions relating to BIA's royalty decision, occurred in the context of DOI's review of an internal decision, under 25 C.F.R. part 2, not in the context of a fiduciary responsibility regarding mineral leases arising under IMLA. The Nation also asserts a breach of trust based on 30 U.S.C. § 207(a), which establishes a minimum royalty rate for coal leases of 12.5%. Section 207(a), which applies to federal land in general, did not apply to leases of Indian land until 1996, when 25 C.F.R. § 211.43(a)(2) was promulgated. The government was not required to conform to the standards set in 30 U.S.C. § 207(a), because, at the time of the government's actions in this case, § 207(a) did not apply to Indian land.

In sum, I agree with the majority that a general fiduciary relationship exists be-

tween the government and the Nation with respect to coal leases on the Nation's lands. However, the analysis cannot stop there. In order to state a claim upon which relief can be granted, the Nation must show the breach of a specific fiduciary obligation that falls within the contours of the statutes and regulations that create the general fiduciary relationship at issue. In my view, the only conduct that is alleged in this case that implicates a specific fiduciary obligation owed by DOI to the Nation is DOI's failure to perform an economic analysis on the Agreement between Peabody and the Nation that was approved by the government under 25 U.S.C. § 396a and 25 C.F.R. § 211.2. I believe that this failure amounted to a breach of a fiduciary obligation owed to the Nation. I would remand the case to the Court of Federal Claims for the limited purpose of determining what damages, if any, the Nation suffered as the results of that breach. Otherwise, I would, in all respects, affirm the decision of the Court of Federal Claims.

For the foregoing reasons, I respectfully concur-in-part and dissent-in-part.