**NAVAJO NATION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 00–5086.**

United States Court of Appeals,
Federal Circuit.

Oct. 24, 2003.

Paul E. Frye, Frye Law Firm, P.C., of Albuquerque, NM, for plaintiff-appellant. Of counsel on the brief was Daniel I.S.J. Rey–Bear, Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., of Albuquerque, NM.

Todd S. Aagaard, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, for defendant-appellee. With him on the brief were R. Anthony Rogers, of Washington, DC, and Kristine S. Tardiff, of Concord, New Hampshire, Attorneys. Of counsel was Elizabeth Ann Peterson, Attorney, of Washington, DC.

V. Thomas Lankford, Lankford & Coffield, P.L.L.C., of Alexandria, VA, for amici curiae Peabody Holding Company, Inc., et al. Of counsel were William F. Coffield and Terrance G. Reed.

Before NEWMAN, SCHALL, and LINN Circuit Judges.

Opinion of the court filed by Circuit Judge SCHALL, in which Circuit Judge LINN joins.

Opinion dissenting in part filed by Circuit Judge PAULINE NEWMAN.

SCHALL, Circuit Judge.

In *Navajo Nation v. United States,* 263 F.3d 1325 (Fed.Cir.2001), this court held that the Indian Mineral Leasing Act of 1938, codified at 25 U.S.C. § 396 *et seq.* ("IMLA"), imposes a fiduciary duty upon the United States, the breach of which could result in money damages. In *United States v. Navajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), the Supreme Court reversed that ruling and remanded the case to us for further proceedings. 123 S.Ct. at 1095. We, in turn, now remand to the Court of Federal Claims for further proceedings as may be appropriate, as discussed below.

## BACKGROUND

### I.

The controversy in this case grows out of the 1987 amendments to a coal lease between the predecessor of Peabody Coal Company ("Peabody") and the Navajo Nation ("Tribe"), a federally recognized Indian tribe. After the Secretary of the Interior ("Secretary") approved the amendments to the lease, the Tribe brought suit against the United States ("government") in the Court of Federal Claims under the Indian Tucker Act, 28 U.S.C. § 1505, alleging, *inter alia,* that the Secretary's approval of the amendments constituted a breach of trust under IMLA.

The Court of Federal Claims granted summary judgment in favor of the government. *Navajo Nation v. United States,* 46 Fed. Cl. 217, 236 (2000). The court determined that the government owed general

fiduciary duties to the Tribe, which, in its view, the Secretary had dishonored by acting in the best interests of Peabody rather than the Tribe. *Id.* Nevertheless, the court concluded that the Tribe had failed to link that breach of duty to any statutory or regulatory obligation which could "be fairly interpreted as mandating compensation for the government's fiduciary wrongs." *Id.* Accordingly, the court held that the government was entitled to judgment as a matter of law. *Id.*

The Tribe appealed to us. We reversed and remanded, holding that IMLA imposes a fiduciary duty upon the government, the breach of which could result in money damages. 263 F.3d at 1333. The Supreme Court granted certiorari. *United States v. Navajo Nation*, 535 U.S. 1111, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002). As noted, the Court reversed and remanded. 123 S.Ct. at 1084.

The Supreme Court noted that its decisions in *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"), and *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*"), controlled the case. 123 S.Ct. at 1084. It stated that "*Mitchell I* and *Mitchell II* are the path-marking precedents on the question of whether a statute or regulation (or combination thereof) 'can fairly be interpreted as mandating compensation by the Federal Government.'" *Id.* at 1089–90 (quoting *Mitchell II*, 463 U.S. at 218, 103 S.Ct. 2961).

In *Mitchell I*, the Court held that the Indian General Allotment Act ("GAA") established insufficient government control and supervision of timber resources to impose upon the government a fiduciary duty, the breach of which could result in money damages. 445 U.S. at 540–44. However, in *Mitchell II*, the Court considered statutes and regulations other than the GAA; the court held that the statutes

and regulations at issue placed a sufficient fiduciary obligation upon the government to warrant money damages for breach of that duty with respect to timber resources. 463 U.S. at 228, 103 S.Ct. 2961. The Court observed that "[i]n contrast to the bare trust created by the [GAA], the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." *Id.* at 224, 103 S.Ct. 2961. Having determined that the statutes and regulations "establish[ed] fiduciary obligations of the Government in the management and operation of Indian lands and resources," the Court concluded that the relevant legislative and executive prescriptions could "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Id.* at 226, 103 S.Ct. 2961. A damages remedy, the Court explained, would "furthe[r] the purposes of the statutes and regulations, which clearly require that the Secretary manage Indian resources so as to generate proceeds for the Indians." *Id.* at 226–27, 103 S.Ct. 2961. In *Navajo Nation*, the Court described what it did in *Mitchell II*: "In *Mitchell II*, we held that a network of other statutes and regulations did impose judicially enforceable fiduciary duties upon the United States in its management of forested allotted lands." 123 S.Ct. at 1090. When the Court referred to "other statutes and regulations," it was, of course, referring to statutes and regulations other than the GAA.

In *Navajo Nation*, relying on its decisions in *Mitchell I* and *Mitchell II*, the Court observed that to state a claim cognizable under the Indian Tucker Act, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.* at 1091 (citing *Mitchell II*, 463 U.S. at 216–17, 103 S.Ct. 2961). If

that threshold is passed, stated the Court, "the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].' " *Id.* (quoting *Mitchell II*, 463 U.S. at 219, 103 S.Ct. 2961). The Court then considered "whether the IMLA and its implementing regulations can fairly be interpreted as mandating compensation for the Government's alleged breach of trust in this case." *Id.* It concluded that they could not. *Id.* It observed that "[t]he IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that *Mitchell II* found adequate to support a claim for money damages." *Id.* It further observed that "[i]nstead, the Secretary's involvement in coal leasing under the IMLA more closely resembles the role provided for the Government by the GAA regarding allotted forest lands." *Id.* at 1092 (citing *Mitchell I*, 445 U.S. at 540–44, 100 S.Ct. 1349).

The Court also rejected the Tribe's argument that the actions of the Secretary violated certain other discrete statutory and regulatory provisions. *Id.* Specifically, the Court rejected the Tribe's arguments that relied on 25 U.S.C. § 399 and the Indian Mineral Development Act of 1982, 25 U.S.C. § 2101 *et seq.* ("IMDA"). 123 S.Ct. at 1092–93. Concerning section 399, the Court explained that the statute is not part of IMLA and does not govern the Peabody lease. *Id.* at 1092. As far as IMDA was concerned, the Court stated that IMDA "does not establish standards governing the Secretary's approval of mining *leases* negotiated by a Tribe and a third party," and the Court added that "[t]he lease in this case ... falls outside the IMDA's domain." *Id.* at 1093. The Court concluded: "[W]e have no warrant from any relevant statute or regulation to conclude that [the Secretary's] conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act." *Id.* at 1095. It thus reversed and remanded. *Id.*

## II.

The Tribe has submitted a "suggestion for proceedings on remand." In its submission, the Tribe states that the Court's decision in *Navajo Nation* was based on IMLA, and that the decision left open consideration of the effect of the "network" of relevant statutes, treaties, and regulations. The Tribe urges us to remand to the Court of Federal Claims so that it can consider the effect of the "network" of relevant statutes, treaties, and regulations.

The government opposes the requested remand. It argues that the Supreme Court's decision was not limited to IMLA. It also argues that the Tribe has waived any argument that "a network of other statutes and regulations" independently provides the basis for a viable breach of trust claim.

## ANALYSIS

The parties' arguments present two issues. First, we must determine if the Supreme Court decided the question of whether, apart from IMLA, "a network of other statutes and regulations," *Navajo Nation*, 123 S.Ct. at 1090, imposes fiduciary duties upon the government, the breach of which could result in money damages. If we conclude that the Supreme Court has not decided that question, we must consider the government's contention that the Tribe has waived any argument that its breach of trust claim is viable independent of IMLA.

### I. Scope of the Supreme Court's decision

The Tribe argues that the Court's decision in *Navajo Nation* was based on

IMLA and that the decision left open for future consideration the issue of what the Tribe calls the "network" of relevant statutes, treaties, and regulations. The Tribe points out that the question presented to the Court in the government's petition for certiorari was directed only to IMLA, as was the question presented in the government's brief before the Court. The Tribe states that although it raised the "network" issue in its brief as Respondent, it was not the question that was brought to the Court. The Tribe points to a similar progression in the *Mitchell* cases, and argues that this situation is directly analogous to the enlargement of decisional premises between *Mitchell I* and *Mitchell II*. It asserts that, in *Navajo Nation*, the Court explicitly stated that it was applying only the IMLA, drawing an analogy to *Mitchell I*, and that it did not consider whether the totality of statutes and regulations could bring coal leasing within the framework of *Mitchell II*. Thus, the Tribe requests remand and the opportunity for full exploration and determination of this issue. For its part, the government argues that the Supreme Court's decision expressly addressed "any relevant statute or regulation," not just IMLA, and the government points out that the Court specifically addressed two other statutes: 25 U.S.C. § 399 and the IMDA.

We agree with the Tribe that the Court directed primary, if not exclusive, attention to IMLA. In its opening statement, the Court stated: "This case concerns the Indian Mineral Leasing Act of 1938 (IMLA), 52 Stat. 347, 25 U.S.C. § 386a *et seq.*, and the role it assigns to the Secretary of the Interior (Secretary) with respect to coal leases executed by an Indian Tribe and a private lessee." 123 S.Ct. at 1084. The Court later stated: "We now consider whether IMLA and its implementing regulations can fairly be interpreted as mandating compensation for the Government's breach of trust in this case." *Id.* at 1091.

As noted, however, the Court also addressed the Tribe's arguments relating to 25 U.S.C. § 399 and IMDA. Under these circumstances, we conclude that the Supreme Court did not address the question of whether, apart from IMLA, "a network of other statutes and regulations," *123 S.Ct.* at 1090, imposes "judicially enforceable fiduciary duties upon the United States," *id.*, in connection with the Peabody lease, although the Court did state that section 399 does not govern the lease at issue and that the lease "falls outside the IMDA's domain." *Id.* at 1093.

The government states that dispositive weight should be placed on the Court's closing statement that "[h]owever one might appraise the Secretary's intervention in this case, we have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act." *Id.* at 1095. The government argues that this shows that the Court considered all statutes and regulations that might contribute to the asserted "network," and thus rejected a "network" argument. We do not agree. While it is true that the Court did give some attention to several statutes besides IMLA, it was IMLA that was extensively discussed and was the focus of the Court's holding: "we hold that the Tribe's claim for compensation from the Federal Government fails, for it does not derive from any liability-imposing provision of the IMLA or its implementing regulations." *Id.* at 1084. The statement to which the government refers should be read in that context.

## II. The question of waiver

As noted above, the government argues that the Tribe has waived any argument that its breach-of-trust claim is viable independent of IMLA. The government con-

tends that the Tribe did not argue in the Court of Federal Claims, this court, or the Supreme Court that, in the words of the Court, "a network of other statutes and regulations ... impose judicially enforceable duties upon the United States" in connection with the Peabody lease. *Id.* at 1090. The Tribe responds that it did preserve this argument, both in the Court of Federal Claims and before us. The critical question, of course, is whether the argument was preserved in the Court of Federal Claims. That issue, we believe, should be decided in the first instance by that court. If the Court of Federal Claims concludes that the issue was properly raised, it should then determine whether any of these statutes can fairly be read as money-mandating in light of the Supreme Court's decisions in *Navajo Nation* and *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), and in light of out own previous decisions in related areas, *see, e.g., White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372–73 (Fed.Cir.2001), *aff'd*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).

## CONCLUSION

The decision of the Supreme Court in this case was limited to the question of whether IMLA imposes judicially enforceable duties upon the United States in connection with the Peabody lease. However, in deciding that issue, the Court stated that 25 U.S.C. § 399 does not govern the lease and that the lease "falls outside IMDA's domain." The Court did not decide whether, apart from IMLA, section 399, and IMDA, "a network of other statutes and regulations" imposes judicially enforceable duties upon the United States in connection with the lease. The case is remanded to the Court of Federal Claims for further proceedings. In the first instance, the court should determine whether, as the government asserts, the Tribe

waived a claim with respect to "a network of other statutes and regulations." If the court determines that such a claim was not waived, it should decide whether, apart from IMLA, section 399, and IMDA, a "network of other statutes and regulations" imposes "judicially enforceable fiduciary duties upon the United States" in connection with the Peabody lease and, if so, whether such duties were breached.

*REMANDED.*

PAULINE NEWMAN, Circuit Judge, dissenting in part.

In *United States v. Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), the Supreme Court reversed this court's ruling that the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396 et seq., imposed a fiduciary duty upon the United States whose breach could lead to money damages. *See Navajo Nation v. United States*, 263 F.3d 1325 (Fed.Cir. 2001). The Court remanded for further proceedings. It is now appropriate to remand to the Court of Federal Claims for determination of whether a "network" of statutory and regulatory provisions provides the requisite fiduciary status in accordance with *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II* ).

I agree that such remand is the next step. However, the panel majority also holds that the Indian Mineral Leasing Act and the Indian Mineral Development Act are to be excluded from consideration in determination of the "network" on remand. This restriction is neither implicit in the Court's decision, nor supportable as a matter of objective analysis. I must, respectfully, dissent from this constraint on the remand criteria.

## DISCUSSION

In February 1964 the Navajo Nation entered into a twenty-year lease with the

predecessor to Peabody Coal Company, for the mining of coal on tribal lands. In conjunction with renewal of that lease, events occurred that this court characterized as a breach of the fiduciary obligations of the United States, relying primarily on the provisions of the Indian Mineral Leasing Act. The Supreme Court, reversing this court's decision, also relied primarily on the Indian Mineral Leasing Act. It is now appropriate for the Court of Federal Claims to determine, in the first instance, whether there is a network of statutes, treaties, and regulations whose content, if enlarged from that considered this far, may affect the nature and consequences of the fiduciary relationship as to this coal leasing activity.

As the majority opinion recognizes, the Court directed primary attention to the Indian Mineral Leasing Act. The Court held that "the Secretary's involvement in coal leasing under the IMLA more closely resembles the role provided for the Government by the GAA [General Allotment Act] regarding allotted forest lands. *See Mitchell I*, 445 U.S. at 540–544, 100 S.Ct. 1349." *Navajo Nation*, 537 U.S. at 508, 123 S.Ct. at 1092. In *Mitchell I* the Court held that the General Allotment Act, the only statute there considered, established insufficient government control and supervision of timber resources to impose upon the United States a fiduciary duty whose breach could lead to money damages. *See* 445 U.S. at 542, 100 S.Ct. 1349 ("We conclude that the [General Allotment] Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources.")

However, in *Mitchell II* the Court considered several additional statutory and regulatory sources of government supervision and control of timber resources, and held that an "elaborate network" of authority placed a sufficient fiduciary obligation upon the United States to warrant money damages for breach of that duty with respect to the timber resources, citing 25 U.S.C. §§ 406–407 regulating timber sales; 25 U.S.C. § 466 regulations and sustained yield; and 25 U.S.C. §§ 318a and 323–325 regulating rights-of-way. In *Mitchell II* the Court considered all sources of federal obligation. For this court now to require exclusion of the major statutory sources of federal control and supervision of coal leases is to negate the principle of the *Mitchell* cases.

Although the Court held in *Navajo Nation* that the Indian Mineral Leasing Act, standing alone, did not support payment of money damages to compensate for the government's breach of trust, the Court did not hold that the Indian Mineral Leasing Act must be excluded from the totality of legislative and executive actions that govern the relationship between the Navajo Nation and the United States. Such an exclusion would be untenable in any determination of this relationship, the nature of the statutory and regulatory obligations, and the consequences of the acts here complained of. Unlike the General Allotment Act of *Mitchell I*, which recognized that the Indian lands were held in trust but was silent as to timber harvesting, the Indian Mineral Leasing Act and its regulations are highly specific as to mineral leasing.

That the Indian Mineral Leasing Act is insufficient standing alone does not bar adding its weight to the totality of statutes, treaties, and regulations governing mineral leasing. For example, the regulations of the Indian Mineral Leasing Act control the size of coal leases by limiting them, with stated exceptions, to 2,560 acres (§ 211.9); they provide that the shape must conform to the system of public land surveys

(§ 211.8); they control the duration of mineral leases (§ 211.10); they require giving priority to government purchases of minerals in times of national emergency (§ 211.11). The regulations require the written permission of the Commissioner of Indian Affairs before a Tribe can enter into negotiations for a lease rather than offer the lease in an advertised sale (25 C.F.R. § 211.2); the regulations mandate that lessees shall provide a bond or other collateral and establish the amount of bond to be secured (§ 211.6); the regulations set forth the corporate information to be furnished to the federal superintendent (defined as "the superintendent or other officer of the Bureau of Indian Affairs or of the Government who may have jurisdiction over the lands involved") (§ 211.7); the regulations establish the federal superintendent's power to require any information he or she deems necessary (§ 211.7). The regulations require that mining operations must be conducted "in accordance with the operating regulations promulgated by the Secretary of the Interior" (§ 211.20); they provide that rents and royalties earned under such leases must be paid to the superintendent "for the benefit of the [Indian] lessors" (§ 211.12); they set minimum royalties for various minerals (§ 211.15). The regulations require that no mining operations can begin until the lease is approved by the Secretary of the Interior. The Secretary may cancel a lease for any violation of the lease terms or regulations, and may do so without the consent of the Indian tribe (§ 211.27).

Under the panel majority's holding, none of these examples of government control and supervision can be considered. That is not a reasonable or fair implementation of the Court's remand. *Mitchell II* stated the question as "whether the statutes and regulations ... clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." 463 U.S. at 225, 103 S.Ct. 2961. Determination of the extent of governmental responsibility requires analysis of the totality of the control and supervision provided by the Indian Mineral Leasing Act along with the other statutes, regulations and treaties that govern this relationship.[1]

In its Respondent's brief in the Supreme Court, the Navajo Nation listed the "Statutes and Regulations Involved":

The following authorities establish comprehensive federal control and supervision over Navajo coal leasing and impose trust duties on the Government: two treaties between the United States of America and the Navajo Tribe of Indians, 9 Stat. 574 (1849) and 15 Stat. 667 (1868); the Indian mineral leasing statutes, 25 U.S.C. §§ 396a–396g, 399, and implementing regulations, 25 C.F.R. pts. 211 and 216 subpart A and 43 C.F.R. pt. 3480; the 1948 Indian right-of-way statute, 25 U.S.C. §§ 323–328, and implementing regulations, 25 C.F.R. pt. 169; the Navajo and Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631–640; the Federal Oil and Gas Royalty Management Act (FOGRMA), 30 U.S.C. §§ 1701–1757, and regulations applying FOGRMA to Indian coal, 30 C.F.R. § 206.450 *et al.* and 25 C.F.R. § 211.40 (applying 30 C.F.R. Chapter II, Sub-

---

**1.** The panel majority instructs the Court of Federal Claims to "determine whether any of these statutes can fairly be read as money-mandating." I note that if any such statute were money-mandating, Navajo would have no need to establish a fiduciary duty in the United States through a network of statutes, regulations, and treaties. None of the stat-

utes relied upon in *Mitchell II* was independently money-mandating; the point of the Court's decision in that case was that the full fiduciary duty of the United States could be established through such a network although none of the individual components was, standing alone, money-mandating.

chapters A and C); and the Indian lands section of the Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. § 1300, and implementing regulations, 25 C.F.R. pt. 216, subpart B, and 30 C.F.R. pts. 750 and 955.

These sources were not explored by the Court, for the "question presented" was limited to the sources on which the Federal Circuit's decision had relied. Now on remand, in determining whether there is a "network" that supports a fiduciary status analogous to that found in *Mitchell II,* all sources must be considered together. From my colleagues' exclusion of the Indian Mineral Leasing Act and the Indian Mineral Development Act from this network, although these statutes and their regulations are major sources of supervision and control of Indian mineral resources by the United States, I must, respectfully, dissent.