# PEORIA TRIBE OF INDIANS OF OKLAHOMA ET AL. *v.* UNITED STATES.

No. 219.   Argued January 15, 1968.—
Decided April 1, 1968.

*Jack Joseph* argued the cause for petitioners.   With him on the briefs was *Louis L. Rochmes.*

*Robert S. Rifkind* argued the cause for the United States.   With him on the brief were *Solicitor General Griswold, Acting Assistant Attorney General Harrison* and *Roger P. Marquis.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On May 30, 1854, the Peoria Tribe of Indians of Oklahoma, petitioner,[1] and the United States, respondent, entered into a treaty under which the Tribe reserved a portion of its lands and ceded the remainder, amounting to some 208,585 acres, to be sold at public auction by the United States for the Tribe's benefit. 10 Stat. 1082. This was provided for in Article 4 of the treaty:

> "[T]he President shall immediately cause the residue of the ceded lands to be offered for sale at public auction . . . . And in consideration of the cessions hereinbefore made, the United States agree to pay to the said Indians, as hereinafter provided, all the moneys arising from the sales of said lands after deducting therefrom the actual cost of surveying, managing, and selling the same."

Article 7 of the treaty further provided:

> "And as the amount of the annual receipts from the sales of their lands, cannot now be ascertained, it is agreed that the President may, from time to time, and upon consultation with said Indians, determine how much of the net proceeds of said sales shall be paid them, and how much shall be invested in safe and profitable stocks, the interest to be annually paid to them, or expended for their benefit and improvement."

In this case the Indian Claims Commission found that the United States violated the treaty in 1857 by selling most of the ceded lands, some 207,759 acres, not by

---

[1] The singular form is used throughout for the petitioners, who were previously known as the Confederated Tribe of the Peoria, Kaskaskia, Wea and Piankeshaw Indians.

public auction, but by private sales at appraised prices lower than would have prevailed at public auction. The Commission found that the United States thus received for the lands $172,726 less than it would have received if the sales had been made as required by the treaty. 15 Ind. Cl. Comm. 123. Neither party questions these findings.

The petitioner, however, sought review in the Court of Claims upon the issue of the measure of its damages for the treaty's violation—contending that by virtue of Article 7 of the treaty, the United States is liable not only for the $172,726, but in addition for the amount that that sum would have produced if "invested in safe and profitable stocks, the interest to be annually paid . . . ." [2] The Court of Claims, two judges dissenting, rejected this contention, 177 Ct. Cl. 762, 369 F. 2d 1001, and we granted certiorari to consider it. 389 U. S. 814.

In supporting the judgment of the Court of Claims, the respondent relies heavily upon the general rule that the United States is not liable for interest on claims against it.[3] This general rule, as the respondent points out, has been held to be fully applicable to the claims of Indian tribes.[4] But this is not a case where the Court

---

[2] The parties are agreed that "the terms 'stocks' and 'interest' should be understood to include bonds or other securities and dividends or other income, respectively." Respondent's Brief 11, n. 4. The term "stocks" was used in other treaties of the period to refer to what would today be called bonds. See, e. g., Cherokee Nation v. United States, 270 U. S. 476, 492. See also Report of the Commissioner of Indian Affairs, November 26, 1853, H. Doc. No. 1, 33d Cong., 1st Sess., 243, 263. The investments actually made pursuant to the treaty in the present case were purchases of state bonds.

[3] See, e. g., United States v. Thayer-West Point Hotel Co., 329 U. S. 585; United States v. N. Y. Rayon Importing Co., 329 U. S. 654; United States v. Goltra, 312 U. S. 203.

[4] See, e. g., United States v. Alcea Band of Tillamooks, 341 U. S. 48; United States v. Omaha Tribe of Indians, 253 U. S. 275,

is asked to exercise "the power to award interest against the United States," *United States* v. *N. Y. Rayon Importing Co.*, 329 U. S. 654, 663. The issue, rather, concerns the measure of damages for the treaty's violation in the light of the Government's obligations under that treaty.

Under Article 7 of the treaty, the United States could at any time pay to the Tribe all or any part of the proceeds received from the sales of the lands at public auction. But until the proceeds were paid over, the United States was obligated to invest them and pay the annual income to the Tribe. The United States was not free merely to hold the proceeds without investing them. The issue in this case, therefore, is whether the obligation of the United States to invest unpaid proceeds applies to proceeds which, by virtue of the United States' violation of the treaty, were never in fact received.

Our decision is largely controlled by *United States* v. *Blackfeather,* 155 U. S. 180. There an 1831 treaty obligated the United States to sell certain Indian lands at public auction and to place all proceeds in excess of a stated amount in a fund for the benefit of the Indians. The fund could be dissolved and paid over to the Indians "during the pleasure of Congress," but until its dissolution, the United States was obligated to pay the Indians an "annuity" upon the retained fund. The lands were sold and the proceeds were paid to the Indians in 1852. In 1893 the Court of Claims held that the United States had violated the treaty by selling some of the lands at private sales rather than at public auction, resulting in the realization of lower prices.[5] This Court held that the obligation to pay the "annuity" applied to the differential that would have been received if the lands had been

---

283; *Confederated Salish & Kootenai Tribes* v. *United States,* 175 Ct. Cl. 451.

[5] *Blackfeather* v. *United States,* 28 Ct. Cl. 447.

sold at public auction in accord with the treaty, and that this obligation extended beyond the dissolution of the fund by Congress in 1852:

"While the treaty bound the government to pay a five per cent annuity until the dissolution of the fund, which dissolution took place September 28, 1852, when the sum of $37,180.58, the amount of the fund resulting from actual sales, was paid over to the chiefs of the tribe, this dissolution terminated the stipulation for the annuity only *pro tanto*. If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid five per cent upon this amount until the whole fund was paid over. The fund as to this amount being not yet distributed, the obligation to pay the five per cent annuity continues until the money is paid over. . . ." 155 U. S., at 193.

Similarly in the case before us, we hold that the obligation to invest the $172,726 and to pay its annual income to the Tribe "continues until the money is paid over." Cf. *United States* v. *Mille Lac Chippewas,* 229 U. S. 498. As the dissenters in the Court of Claims rightly pointed out,

"Indian treaties 'are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them.' *United States* v. *Shoshone Tribe,* 304 U. S. 111, 116 (1938). '[T]hey are to be construed, so far as possible, in the sense in which the Indians understood them, and "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent

people." *Tulee* v. *Washington,* 315 U. S. 681, 684–85. . . .' " 177 Ct. Cl., at 771, 369 F. 2d, at 1006–1007.

Since the Indian Claims Commission and the Court of Claims erroneously held that the United States is not liable for its failure to invest the proceeds that would have been received had the United States not violated the treaty, they had no occasion to determine the measure of damages resulting from this liability. Accordingly, we remand this case to the Court of Claims for further remand to the Indian Claims Commission in order to determine that question.[6]

The judgment of the Court of Claims is reversed and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[6] The respondent did not brief or argue the question of how to measure these damages. The petitioner suggested that these damages might be measured by looking to the rate of interest which the United States has paid on Indian funds over the same period, arguing for this approach by analogy to private trust law. The petitioner also points out that Congress at one time considered the United States' treaty obligations to "invest in safe and profitable stocks" satisfied by an annual appropriation for the Indians of an amount equivalent to an interest payment. See Report of the Commissioner of Indian Affairs, November 30, 1852, S. Doc. No. 1, 32d Cong., 2d Sess., 293, 300–301; Report of the Commissioner of Indian Affairs, November 26, 1853, *supra,* n. 2.

Because the United States is not liable for interest on judgments in the absence of an express consent thereto, it cannot be liable for interest on the annual income payments not made. Therefore, if an interest rate measure is adopted by the Commission, it must be simple and not compound interest.