The **SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION,** Plaintiff–Cross Appellant,

and

The **Arapaho Indian Tribe of the Wind River Reservation, Plaintiff–Cross Appellant,**

v.

**UNITED STATES, Defendant–Appellant.**

Nos. 03–5036, 03–5037.

United States Court of Appeals, Federal Circuit.

DECIDED: April 7, 2004.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Steven D. Gordon, Holland & Knight LLP, of Washington, DC, argued for plaintiff-cross appellant The Shoshone Indian Tribe of the Wind River Reservation. With him on the brief were Lynn E. Calkins and Maria Whitehorn Votsch. Also on the brief was Richard M. Berley, Ziontz, Chestnut, Varnell, Berley & Slonim, of Seattle, WA, who argued for plaintiff-cross appellant The Arapaho Indian Tribe of the Wind River Reservation. With him on the brief was Brian W. Chestnut.

Robert H. Oakley, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for United States. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; Jeffrey Bossert Clark, Deputy Assistant Attorney General; and Stuart Schoenburg, Attorney. Of counsel was Stephen L. Simpson, Attorney, Office of the Solicitor, United States Department of Interior, of Washington, DC.

Melody L. McCoy, Native American Rights Fund, of Boulder, CO, for amicus curiae Chippewa Cree Tribe of the Rocky Boy's Reservation. Also on the brief was Jeanne S. Whiteing, Whiteing & Smith, of Boulder, CO, for amicus curiae Blackfeet Tribe of the Blackfeet Indian Reservation.

Before RADER, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

Opinion for the court filed by Circuit Judge GAJARSA. Opinion dissenting-in-part filed by Circuit Judge RADER.

GAJARSA, Circuit Judge.

The United States government appeals from the decision by the Court of Federal Claims permitting the Shoshone and Arapaho Indian Tribes of the Wind River Reservation (the "Tribes") to bring allegedly untimely claims relating to the Government's management of sand and gravel resources on the reservation. *The Sho-*

shone Indian Tribe of the Wind River Reservation v. United States, No. 458a–79L, 459a–79L (Fed.Cl. Oct. 10, 2002) (order providing for final judgment on the issues of the statute of limitations and applicable interest) (the "*Shoshone Final Judgment Order*"); *see also The Shoshone Indian Tribe of the Wind River Reservation v. United States*, 51 Fed.Cl. 60 (2001). In addition, the Tribes submit a cross-appeal, arguing that the Court of Federal Claims erred in denying the Tribes interest on money that the Government should have, but did not, collect from the sale and leasing of sand and gravel deposits. *Shoshone Final Judgment Order*, at 1; *see also The Shoshone Indian Tribe of the Wind River Reservation v. United States*, No. 458a–79L, 459a–79L (Fed. Cl. June 21, 2002) (order denying interest to Tribes) (the "*Shoshone Interest Order*").

Because the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108–7, permits the Tribes to bring their trust management claims after they receive an accounting—regardless of when such claims accrued—this court affirms the Court of Federal Claims' decision on direct appeal. We limit, however, the claims that may be brought to those relating to (1) the Government's mismanagement of tribal trust funds after their collection and (2) losses to the trust resulting from the Government's failure to timely collect amounts due and owing to the Tribes under its sand and gravel contracts.

With respect to the Tribes' cross-appeal, we reverse the Court of Federal Claims' denial of interest and hold that the Tribes are entitled to interest on monies that the Government was contractually obligated to collect, but did not collect or delayed in collecting, on behalf of the Tribes.

We thus affirm-in-part, reverse-in-part, and remand the case for further proceedings.

## I. BACKGROUND

### A. The Wind River Reservation

The Eastern Shoshone Tribe (the "Shoshone") and the Northern Arapaho Tribe (the "Arapaho") share an undivided interest in the Wind River Indian Reservation (the "Wind River Reservation" or the "reservation") in Wyoming. *Shoshone Indian Tribe*, 51 Fed.Cl. at 61. The Shoshone originally occupied approximately 44,672,000 acres across Wyoming, Colorado, Idaho, and Utah. In 1868, the Shoshone signed a treaty with the United States (the "Treaty of 1868") and agreed to relinquish their aboriginal lands and relocate onto a reservation established for their benefit. In this treaty, the Government agreed that the reservation would be:

> set apart for the absolute and undisturbed use and occupation of the Shoshonee Indians herein named, ... and henceforth *they will and do hereby relinquish all title, claims, or rights in and to any portion of the territory of the United States*, except such as is embraced within the limits aforesaid.

Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe of Indians, July 3, 1868, art. II, 15 Stat. 673 (emphasis added). By signing the Treaty of 1868, the Shoshone relinquished to the Government title to their aboriginal lands and reserved a right of occupancy and use to the Wind River Reservation. *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 496, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *cf. United States v. Creek Nation*, 295 U.S. 103, 109, 55 S.Ct. 681, 79 L.Ed. 1331 (1935) (discussing the right of occupancy as compared to a fee simple).

In 1878, the United States military escorted the Arapaho onto the Wind River Reservation, where the Arapaho were settled by the Government on the Wind River Reservation despite protests by the Sho-

shone. *Shoshone,* 299 U.S. at 494, 57 S.Ct. 244. Against their respective wishes, the Shoshone and Arapaho Tribes were made owners in common of the Wind River Reservation, with undivided rights to the land and its accompanying mineral resources, by Congressional act. Act of Mar. 3, 1927, §§ 1, 3, 44 Stat. 1349, 1350; *Shoshone,* 299 U.S. at 494, 57 S.Ct. 244. Both Tribes continue to occupy the Wind River Reservation, which consists primarily of the reservation lands created by the Treaty of 1868, minus certain lands sold to the United States in 1872 and 1896.

In addition to establishing co-ownership of the Wind River Reservation, the Act of March 3, 1927 also permitted the Shoshone to bring claims against the Government in the Court of Claims arising from the settlement of the Arapaho. Until the passage of the Indian Claims Commission Act in 1946 (the "ICC Act"), tribes could not litigate claims against the United States without specific Congressional permission. Act of Mar. 3, 1927, §§ 1, 3, 44 Stat. 1349, 1350; *Shoshone,* 299 U.S. at 494, 57 S.Ct. 244; *see also Navajo Tribe of Indians v. State of New Mexico,* 809 F.2d 1455, 1460 (10th Cir.1987) (discussing the history of the ICC Act). After receiving access to the Court of Claims, the Shoshone filed suit and were eventually awarded damages for the taking of the Shoshone's right of occupancy under the Treaty of 1868. *Shoshone,* 299 U.S. at 497–98, 57 S.Ct. 244.

On October 10, 1979, the Tribes brought suit in the United States Court of Claims, alleging that the Government breached fiduciary and statutory duties owed to the Tribes from August 14, 1946 onward by mismanaging the reservation's natural resources and the income derived from such resources. The date of August 14, 1946

chosen by the Tribes coincides with the passage of the ICC Act. The ICC Act provided a five-year window of time during which tribes could submit to the Indian Claims Commission all of their claims against the Government that accrued before August 13, 1946. Courts have therefore held that claims "accruing before August 13, 1946" that were not filed with the Commission by August 13, 1951 cannot be submitted to any court, administrative agency, or the Congress. 60 Stat. 1052 (formerly 25 U.S.C. § 70k); *Navajo Tribe,* 809 F.2d at 1461; *Catawba Indian Tribe of S.C. v. United States,* 24 Cl.Ct. 24, 29 (1991).

The Court of Federal Claims severed the Tribes' present action into four segments: (1) claims relating to mineral rights, including sand and gravel resources; (2) claims relating to royalties associated with oil and gas deposits; (3) all other claims relating to oil and gas extraction; and (4) claims relating to trust fund mismanagement. *Shoshone Indian Tribe,* 51 Fed.Cl. at 62.

**B. Sand and Gravel Litigation**

The current appeal stems from the first segment of litigation and involves the alleged mismanagement of sand and gravel resources by the Government. The sand and gravel claims of the Tribes were severed from the rest of the claims by order of the Court of Federal Claims. *The Shoshone Indian Tribe of the Wind River Reservation v. United States,* No. 458a–79–459a–79L (Fed. Cl. June 13, 2001) (order severing claims).[1]

In its pre-trial motions related to the sand and gravel claims, the Government moved the Court of Federal Claims to bar

---

1. The litigation regarding the management of oil and gas reserves on the Wind River Reservation is still pending in the Court of Federal Claims. *See The Shoshone Indian Tribe of the*

*Wind River Reservation v. United States,* 58 Fed. Cl. 542 (2003) (interim order on motions in limine).

any claim by the Tribes that accrued prior to October 10, 1973, the date that corresponds to six years before the Tribes' complaint was filed. *Shoshone Indian Tribe,* 51 Fed.Cl. at 61. The Government argued that 28 U.S.C. § 2501, which imposes a six-year statute of limitations on claims brought against the United States, should apply to limit the Tribes' ability to recover for alleged injuries occurring between 1946 and 1973. *Id.* at 61–62.

In response, the Tribes cited the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108–7 (the "Act"), which provides in pertinent part:

> [N]otwithstanding any other provision of law, the statute of limitations *shall not commence to run* on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning *losses to or mismanagement of trust funds,* until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub.L. No. 108–7 (2003) (emphasis added). An earlier version of the Act was first adopted in 1990 and has been adopted each year thereafter, with minor changes in 1991 and 1993.[2]

The Court of Federal Claims denied the Government's motion on November 30, 2001. *Shoshone Indian Tribe,* 51 Fed.Cl. at 61. The gravamen of the Government's motion was that the six year statute of limitations on claims against the Government provided by 28 U.S.C. § 2501 had already run on many of the Tribes' claims and that the Act therefore did not reach such claims. Relying on the plain language of the Act, the court determined that claims falling within the scope of the Act do not *accrue* until an accounting "concerning losses to or mismanagement of trust funds" is provided. Because the Tribes had not received an accounting, the Court of Federal Claims thus permitted the Tribes to present evidence of economic losses resulting from the Government's mismanagement of tribal trust funds and sand and gravel resources from 1946 onward.

The Tribes' cross-appeal concerns the Court of Federal Claims' decision denying the Tribes interest on monies that the Government failed to collect with respect to the sand and gravel mining leases on the reservation. The Tribes argued before the Court of Federal Claims that 25 U.S.C. § 612, which establishes a trust for the Shoshone and Arapaho Tribes, requires the Government to pay interest on funds that the Government should have, but did not, collect and deposit in the tribal trust. In pertinent part, 25 U.S.C. § 612 provides:

> The Secretary of the Treasury, upon request of the Secretary of the Interior, is authorized and directed to establish a trust fund account for each tribe and shall make such transfer of funds on the books of his department as may be necessary . . .: Provided, *That interest shall accrue on the principal fund only, at the rate of 4 per centum per annum,*

<hr>

2. Pub.L. No. 101–512 (1990) originally provided:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds.

In 1991, the clause "from which the beneficiary can determine whether there has been a loss" was added to the end of the provision. Pub.L. No. 102–154 (1991). In 1993, Congress added "including any claim in litigation pending on the date of this Act." Pub.L. No. 103–138 (1993).

and shall be credited to the interest trust fund accounts established by this section: Provided further, That *all future revenues and receipts derived from the Wind River Reservation under any and all laws,* and the proceeds from any judgment for money against the United States hereafter paid jointly to the Shoshone and Arapahoe Tribes of the Wind River Reservation, shall be divided [between the Tribes] and *credited to the principal trust fund accounts* established herein; and the proceeds from any judgment for money against the United States hereafter paid to either of the tribes singly shall be credited to the appropriate principal trust fund account. 25 U.S.C. § 612 (2000) (emphasis added). The Tribes further argued that the general statutes governing Indian trust fund management, 25 U.S.C. §§ 155, 161a, 161b, and 162a, mandate the payment of interest. Under 25 U.S.C. § 155, miscellaneous revenues derived from tribal resources are to be deposited with the Treasury, and under 25 U.S.C. §§ 161a, 161b, and 162a, simple interest must be collected on such accounts. *See* 25 U.S.C. §§ 155, 161a, 161b, 162a.

On June 21, 2002, the Court of Federal Claims determined that the Government would not be responsible for interest on any damages awarded to the Tribe for trust fund mismanagement. *Shoshone Interest Order,* at 2. In its order, the court reasoned that 25 U.S.C. § 612 did not provide the "necessary 'hook' " to award interest damages against the United States under the Supreme Court's decision in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1982) ("*Mitchell II*"). *Shoshone Interest Order,* at 2. The court did not address the availability of 25 U.S.C. §§ 155, 161a, 161b, and 162a to require the payment of interest.

On the basis of its orders of November 30, 2001 and June 21, 2002, the Court of Federal Claims (1) granted judgment in favor of the Tribes on the issue of the statute of limitations and (2) granted judgment in favor of the Government on the issue of interest. *Shoshone Final Judgment Order,* at 1. Except for these two issues, the parties have settled the claims concerning the sand and gravel resource management. *The Shoshone Indian Tribe of the Wind River Reservation v. United States,* No. 458a–79L, 459a–79L (Fed.Cl. Oct. 4, 2002) (order approving partial settlement).

This Court has jurisdiction of the appeal and cross-appeal pursuant to 28 U.S.C. § 1295(a)(3).

## II. DECISION

### A. *Standard of Review*

The issue before us is one of statutory construction. This court reviews the construction and interpretation of governing statutes *de novo. Massie v. United States,* 166 F.3d 1184, 1187 (Fed.Cir.1999); *Dock v. United States,* 46 F.3d 1083, 1086 (Fed.Cir.1995). The plain language of a statute is controlling. *Int'l Bus. Machs. Corp. v. United States,* 201 F.3d 1367, 1373 (Fed.Cir.2000).

### B. *The Act*

#### 1. Statute of Limitations

In challenging the Court of Federal Claims' decision concerning the statute of limitations for the Tribes' claims, the Government relies on the ambiguous language of the House and Senate Reports associated with the Act, rather than on the language of the statute itself. The language of the statute is the best indication of Congress's intent. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). When the language of a statute is plain on its face, it is inappropriate

to turn to the legislative history.[3] *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002).

■■■ The statute of limitations provision of 28 U.S.C. § 2501 places an express limit on the Government's waiver of sovereign immunity for every claim within the jurisdiction of the Court of Federal Claims. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Hart v. United States*, 910 F.2d 815, 817 (Fed.Cir.1990). Statutes that toll the statute of limitations, resurrect an untimely claim, defer the accrual of a cause of action, or otherwise affect the time during which a claimant may sue the Government also are considered a waiver of sovereign immunity. *See Martinez v. United States*, 333 F.3d 1295, 1316 (Fed.Cir.2003) (noting that exceptions to statutes of limitations on suits against the Government are not to be implied); *see also Soriano*, 352 U.S. at 276, 77 S.Ct. 269. Such statutes must be construed strictly and must clearly express the intent of Congress to permit a suit against the Government. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) ("We have frequently held, however, that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.... Such a waiver must also be 'unequivocally expressed' in the statutory text." (citations omitted)); *United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1572 (Fed.Cir. 1994). By the plain language of the Act, Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided.

The operative language of the Act is the combination of the phrases "[n]otwithstanding any other provision of law" and the directive that the statute of limitations "shall not commence to run" on any claim until an accounting is provided from which the Tribes can discern whether any losses occurred which would give rise to a cause of action against the trustee. The introductory phrase "[n]otwithstanding any other provision of law" connotes a legislative intent to displace any other provision of law that is contrary to the Act, including 28 U.S.C. § 2501. *See, e.g., Marcello v. Bonds*, 349 U.S. 302, 310–11, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (finding the inclusion of the phrase "Notwithstanding any other provision of law" in earlier drafts of a bill enough to show the intent of Congress to supersede § 5(c) of the Administrative Procedure Act even though the final bill deleted the language); *Watt v. Alaska*, 451 U.S. 259, 280, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (Stewart, J., dissenting) (stating that Congress "ideally" would have used the phrase "notwithstanding any other provision of law" to express its intent to have the Wildlife Refuge Revenue Sharing Act of 1964 supersede the Mineral Leasing Act of 1920).

---

3. Only two courts have interpreted the Act prior to this appeal. In the unpublished decision of *Assinboine & Sioux Tribes of the Fort Peck Indian Reservation*, No. 773–87L (Fed.Cl. 1995), the Court of Federal Claims found that the Act deferred the accrual of the statute of limitations until an accounting was provided. That court cited the legislative history surrounding the Act's renewal in 1993, specifically a House Report that provided that the purpose of the Act was to "protect the rights of tribes and individuals until reconciliation and audit of their accounts has been completed." H.R.Rep. No. 103–158, at 57 (1993).

In *Cobell v. Babbitt*, a district court determined that the Act merely tolls the statute of limitations. 30 F.Supp.2d 24 (D.D.C.1998). Citing the same sentence from the House Report relied on in *Assinboine*, the District Court came to the opposite conclusion from the legislative history. *Id.* at 44.

■ The next important phrase of the Act, "shall not commence to run," unambiguously delays the commencement of the limitations period until an accounting has been completed that reveals whether a loss has been suffered. As the Tribes point out, most statutes use the word "toll" when the purpose of the statute is to interrupt the statute of limitations. *See, e.g.,* 12 U.S.C. § 3419 (2000); 15 U.S.C. § 6606(e)(4) (2000); 21 U.S.C. § 1604(b)(3)(C) (2000); 29 U.S.C. § 1854(f) (2000). Congress's choice of the phrase "shall not commence to run" instead of "tolls" should be given effect. There exists a strong presumption that "Congress expresses its intent through the language it chooses". and that the choice of words in a statute is therefore deliberate and reflective. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 433 n. 12, 436, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *see also Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 223, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) ("Normal principles of statutory construction require that we give effect to the subtleties of language that Congress chose to employ...."); *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (refusing to give a re-

strictive meaning to the word "person" because Congress could have, but did not, use more particular language).

Unlike the Government, we see no ambiguity in the language used by Congress. The clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed. We therefore hold that the Act provides that claims falling within its ambit shall not accrue, i.e., "shall not commence to run," until the claimant is provided with a meaningful accounting.[4] This is simple logic—how can a beneficiary be aware of any claims unless and until an accounting has been rendered?

■ The interpretation of the Act provided by this court also comports with fundamental trust law principles. Beneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets. *Loudner v. United States,* 108 F.3d 896, 901 (8th Cir.1997); *Cobell v. Norton,* 260 F.Supp.2d. 98, 104 (D.D.C.2003); *Manchester Band of Pomo Indians v. United States,* 363 F.Supp. 1238 (N.D.Cal.1973).

---

4. Our interpretation of the Act also comports with an examination of other statutes that affect the accrual of a cause of action. For example, the Court of Federal Claims is permitted to hear claims by the Pueblo of Isleta tribe regardless of the time incurred. The applicable statute provides:

> Notwithstanding sections 2401 and 2501 of title 28, United States Code, and section 12 of the Act of August 13, 1946 · (60 Stat. 1052), or any other law which would interpose or support a defense of untimeliness, jurisdiction is hereby conferred upon the United States Court of Federal Claims to hear, determine, and render judgment on any claim by Pueblo of Isleta Indian Tribe of New Mexico against the United States with respect to any lands or interests therein the State of New Mexico or any adjoining State held by aboriginal title or other-

wise which were acquired from the tribe without payment of adequate compensation by the United States.

Pub.L. No.104–198 (1996).

The Act's introductory phrase "notwithstanding any other provision of law" parallels the above recitation listing a number of statute of limitations provisions and declaring that they are inapplicable. Moreover, like the passage quoted, the Act specifically outlines the types of claims that are exempted from the standard statute of limitations. In the case of the Pueblo of Isleta tribe, the claims involve the Government's payment of inadequate compensation for tribal lands. In the case before this court, the claims are limited to those "concerning losses to or mismanagement of trust funds." We address the interpretation of that phrase *infra* at Part II.B.2 of this opinion.

**1348**

As the Supreme Court explained in *Mitchell II*, "[a] trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement." 463 U.S. at 227, 103 S.Ct. 2961.

▆▆▆ A cause of action for breach of trust traditionally accrues when the trustee "repudiates" the trust and the beneficiary has knowledge of that repudiation. *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573 (Fed.Cir.1988); *Restatement (Second) of Trusts* § 219 (1992); *Cobell,* 260 F.Supp.2d at 105; *Manchester Band of Pomo Indians,* 363 F.Supp. at 1249. A trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee. *Jones v. United States,* 801 F.2d 1334, 1336 (Fed.Cir.1986); *Philippi v. Philippe,* 115 U.S. 151, 5 S.Ct. 1181, 29 L.Ed. 336 (1885). The beneficiary, of course, may bring his action as soon as he learns that the trustee has failed to fulfill his responsibilities. 3 *Scott on Trusts* §§ 199.3, 205 (2001). It is often the case, however, that the trustee can breach his fiduciary responsibilities of managing trust property without placing the beneficiary on notice that a breach has occurred. It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust. 76 *Am.Jur.2d Trusts* § 440 (2000); *McDonald v. First Nat'l Bank of Boston,* 968 F.Supp. 9, 14 (D.Mass.1997).

In this case, the United States is the trustee for the Tribes, having assumed the relationship of trustee-beneficiary pursuant to treaties and statutes. That a general trustee relationship exists between the Government and tribal nations has long been recognized by the Supreme Court. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8, 8 L.Ed. 25 (1831) (describing the relationship of tribes with the United States as that of a "ward to his guardian"); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832) (elaborating on a duty of protection undertaken by the United States with respect to the native tribes); *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961 (noting the "undisputed existence of a general trust relationship between the United States and the Indian people").

▆▆▆ Because of its treaty and statutory obligations to tribal nations, the United States must be held to the "most exacting fiduciary standards" in its relationship with the Indian beneficiaries. *Coast Indian Cmty. v. United States,* 213 Ct.Cl. 129, 550 F.2d 639, 652 (1977). The Indian Tribes, as domestic dependent nations, were subjected to the imposition of the trustee-beneficiary relationship and have become reliant upon their trustee to carry out trustee responsibilities. *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961.

*2. The Scope of the Act*

In addition to interpreting the Act's effect on the statute of limitations, this Court must determine which claims are within the scope of the Act. The Act postpones the commencement of the statute of limitations for "any claim ... concerning *losses to or mismanagement of trust funds.*" (emphasis added). In its interpretation of the Act, the Court of Federal Claims focused on the disjunctive term "or" between the two phrases "losses to" and "mismanagement of" tribal trust funds. *Shoshone Indian Tribe,* 51 Fed.Cl. at 68. The court determined that "mismanagement of trust funds" plainly covers a breach of fiduciary duty in the management of money already received in the trust. *Id.* The court then interpreted "losses to ... trust funds" as corresponding to the Government's mismanagement of trust assets and the "breach of its trust

duty to 'make the trust property productive'...." *Id.* The interpretation by the court below thus permitted the Tribes to bring claims from 1946 onward relating to the Government's management of the sand and gravel leasing, including claims that the Government did not receive the best possible price for the leases negotiated. *Id.*

■ As part of its appeal, the Government argues that the Act applies only to claims for the mismanagement or loss of tribal funds that were actually collected and deposited into the tribal trusts by the Government. Under the Government's proposed interpretation of "losses to or mismanagement of trust funds," the phrase "mismanagement of trust funds" would connote active misconduct relating to the tribal funds and "losses to ... trust funds" would apply to "purely passive behavior" resulting in a decrease in the trust funds. Under the Government's theory of liability, the Act would not apply to losses that the Tribes alleged occurred because of the Government's failure to collect rents or to collect rents in a timely manner or to timely deposit such rents into the tribal trust accounts.

We reject the Government's narrow reading of the Act. If the Government's interpretation were adopted, the term "losses to" would be redundant—the mismanagement of trust funds after their collection necessarily results in a loss to such funds. *Shoshone Indian Tribe*, 51 Fed.Cl. at 68. Accepted rules of statutory construction suggest that we should attribute meaning to all of the words in the Act if possible. *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1882) ("It is the duty of the court to give effect, if possible, to every clause and word of a

statute...."); *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); Norman J. Singer, *Sutherland on Statutory Construction* § 46.06, at 181–96 (6th ed.2000).

At the same time, the Court of Federal Claims' interpretation of the Act's language is overly expansive. We first must note that the Supreme Court's recent decision in *United States v. Navajo Nation* may moot the Tribes' claims relating to a breach of trust for *asset* mismanagement pursuant to the Indian Mineral Leasing Act ("IMLA") of 1938, i.e., claims that the Government failed to obtain the best possible market rates for the sand and gravel contracts. *See United States v. Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003). In *Navajo Nation*, the Supreme Court held that the IMLA does not impose a fiduciary obligation on the Government to manage the negotiation of tribal coal leases and maximize the lease revenues received. *Id.* at 507, 123 S.Ct. 1079. Reviewing the responsibilities owed by the Government to the Navajo under the IMLA, the Court determined that the Government was charged with approving mineral leases and regulating mining operations, but was not otherwise responsible for obtaining the highest and best price for the leases of tribal coal deposits. *Id.* at 507–08, 123 S.Ct. 1079; *see also* 25 U.S.C. § 396a (requiring that the Secretary of the Interior approve mineral leases); 25 U.S.C. § 396d (providing that the Secretary promulgate regulations relating to mining operations). While the Court in *Navajo Nation* specifically limited its holding to coal leasing, 537 U.S. at 508 n. 11, 123 S.Ct. 1079, the IMLA alone does not impose any additional responsibilities on the Government relating to the management of sand and gravel leases.[5] *See* 25

---

5. We do not, in this opinion, reach the question of whether a claim for asset mismanagement under statutes other than the IMLA is viable. *See Navajo Nation v. United States,*

347 F.3d 1327, 1332 (Fed.Cir.2003). The issue of whether "a network of other statutes and regulations" may create a trust obligation

U.S.C. § 396a *et seq.; see also* 25 C.F.R. § 211.3 (defining mineral to include sand and gravel resources, thus establishing that such resources are subject to the IMLA). Like the coal leases at issue in *Navajo Nation,* the Government's responsibilities relating to the management of mineral assets such as sand and gravel is limited to the general obligation to approve leases and regulate removal operations under 25 U.S.C. § 396a and § 396d respectively. In light of *Navajo Nation,* we are compelled to find that the Tribes' argument that the Government mismanaged its sand and gravel assets is not a valid claim for relief given that the Government did not have a fiduciary or statutory duty to maximize the prices obtained under the leases entered into between the tribes and third parties. As such, the language in the Act "losses to or mismanagement of trust funds" cannot be used to delay the accrual of a cause of action for failure to obtain a maximum price of the mineral assets since such an action is not within the contemplated scope of the IMLA.

Even if a claim for a breach of the fiduciary duty to obtain a maximum return from the mineral assets had been available, however, the plain language of the Act excludes such a claim. The Act covers claims concerning "losses to ... trust *funds*" rather than losses to mineral trust *assets.* While it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets.* The Court of Federal Claims therefore erred in equating the mismanagement of trust *assets* with "losses to ... trust *funds.*"

While *Navajo Nation* forecloses holding the United States responsible for allegedly failing to maximize the return from the Tribes' sand and gravel mining leases, it does not foreclose liability for failing to manage or collect the *proceeds* from the approved mining contracts in violation of the trust responsibilities owed under the implementing regulations of the IMLA. Pursuant to 25 C.F.R. § 211.40 and related regulations in 30 C.F.R., Subchapters A and D, the Government collects and manages all payments relating to the mineral leases unless such leases specify otherwise. The Government then must deposit and accrue interest on such proceeds pursuant to the general trust provisions of 25 U.S.C. §§ 161a, 161b, and 162a, and, in the case of the Tribes, pursuant to 25 U.S.C. § 612. It therefore is clear that the Tribes have a possible claim against the United States for the alleged breach of the Government's fiduciary duty to manage and collect revenues derived from the mining leases.

A review of the language of the Act confirms that the Act defers the accrual of a cause of action relating to the Government's fiduciary duties to collect revenue for the Tribes' leases. In the context of the Act, "losses to ... trust funds" may be understood to cover losses resulting from the Government's failure to timely collect amounts due and owing to the Tribes under its sand and gravel contracts. We therefore interpret the phrase "losses to ... trust funds" to mean losses resulting from the Government's failure or delay in (1) collecting payments under the sand and gravel contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment. Fiduciary breaches

for tribal asset management on the part of the Government is currently on remand to the

Court of Federal Claims. *Id.*

such as these result in losses to trust funds that are separate and distinct from the mismanagement of trust funds once collected.

We finally note that the interpretation of "losses to ... trust funds" as accounts receivable due and owing to the Tribes has certain evidentiary advantages. As part of its duties, a trustee must keep clear and accurate accounts, showing what he has received, what he has expended, what gains have accrued, and what losses have resulted. 2A *Scott on Trusts* § 172 (2001). An accounting alone will not reveal the mismanagement of tribal assets; a comparison with historical market prices is required, creating a large burden on the parties and the courts. In contrast, the comparison of pertinent mining contracts with the results of an accounting will reveal what income was required to be received by the Government but was either not received or was received late.

Based on the language of the Act and statutory rules of construction, we conclude that the Act covers any claims that allege the Government mismanaged funds after they were collected, as well as any claims that allege the Government failed to timely collect amounts due and owing to the Tribes under its sand and gravel contracts.

## C. *Interest*

■ On cross-appeal, the Tribes argue that the Government should pay interest on amounts that it should have received, but did not receive, as a result of sales of the reservation's sand and gravel interests. We hold that the Tribes are permitted to receive interest on monies that the Government was obligated to collect on behalf of the Tribes under the leases, but did not collect or delayed in collecting.

Pursuant to 28 U.S.C. § 2516, a court is prohibited from awarding prejudgment interest against the United States unless such interest is specifically authorized by a contract or act of Congress. 28 U.S.C. § 2516 (2000). In addition, the Supreme Court held in *Mitchell II* that a claimant may recover against the United States only if he or she demonstrates that a source of substantive law can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." 463 U.S. at 216–17, 103 S.Ct. 2961.

In denying interest to the Tribes, the Court of Federal Claims determined that 25 U.S.C. § 612, which specifically requires interest to accrue on proceeds deposited in trust accounts for the Shoshone and Arapaho Tribes, is not money-mandating under *Mitchell II. Shoshone Interest Order*, at 2. To support its decision, the court stated that because 25 U.S.C. § 612 requires the payment of interest on postjudgment awards but is silent as to prejudgment interest awards, pre-judgment interest is not contemplated under the statute. *Id.*

The Court of Federal Claims erred in its analysis of the language of 25 U.S.C. § 612. Although the court was correct that the statute does not use the express term "pre-judgment interest," we interpret the statute as providing a substantive basis for the award of interest as part of the Tribes' damages. *See Short v. United States*, 50 F.3d 994, 998 (Fed.Cir.1995). Under 25 U.S.C. § 612, the Government is obligated to pay interest on *all* revenues derived from the Wind River Reservation, not just the revenues that the Government collected. Specifically, 25 U.S.C. § 612 requires the Secretary of the Treasury to credit to a principal trust fund for the Tribes "*all* future revenues and receipts derived from the Wind River Reservation under any and all laws." (emphasis added). In addition, 25 U.S.C. § 612 provides that "interest shall accrue on the principal fund

only, at the rate of 4 per centum per annum." To the extent that the Government did not deposit "*all* future revenues and receipts derived from the Wind River Reservation," which in the present case would include revenues and receipts derived from the sand and gravel contracts, it has breached the provisions of 25 U.S.C. § 612.[6] The direct consequence of this breach is that the Tribes were denied interest on the full amount that should have been, but was not, collected under their sand and gravel contracts.

 Because the Government was obligated under 25 U.S.C. § 612 to both credit the principal account with *all* future revenues and receipts and to accrue interest at the stated rate, the provisions of 25 U.S.C. § 612 are therefore clear and unambiguous and are interpreted to permit recovery for interest on revenues and receipts that the Government failed to collect or delayed in collecting under the Tribes' sand and gravel contracts.[7] Adding even further support for this interpretation is the longstanding canon of statutory construction that "statutes are to be construed liberally in favor of the Indians...." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985);

*Winters v. United States,* 207 U.S. 564, 576, 28 S.Ct. 207, 52 L.Ed. 340 (1908) (stating that ambiguities should be resolved "from the standpoint of the Indians"); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (stating that pro-Indian statutory construction has been a canon of construction used since the early 1800s); *see Chickasaw Nation v. United States,* 534 U.S. 84, 93–95, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (recognizing the pro-Indian canon of construction, which "assumes Congress intends its statutes to benefit the tribes"); *see also Thompson v. Cherokee Nation of Okla.,* 334 F.3d 1075, 1090 (Fed.Cir.2003) (finding it unnecessary to utilize the Indian canon of construction because the statute at issue was not ambiguous). We therefore hold that 25 U.S.C. § 612 mandates the payment of interest on monies that the Government was contractually obligated to collect, but failed to collect or delayed in collecting.

The Supreme Court's decision in *Peoria Tribe of Indians of Oklahoma v. United States* further supports this court's reversal of the Court of Federal Claims' decision. In *Peoria Tribe,* the Government entered into a treaty that required it to

6. The legislative history of 25 U.S.C. § 612 also reveals that Congress anticipated that most of the funds to be deposited in the trust would come from the mineral resources on the reservation. *See* H.R.Rep. No. 80–172, at 2 (1947); S.Rep. No. 80–117, at 2 (1947).

7. The dissent erroneously considers the interest that the Government is required to pay on the Tribes' trust principal under 25 U.S.C. § 612 to be a form of pre-judgment interest. Unlike the situation in *Mitchell II,* however, the Government had an obligation to collect the payments from the Tribes' sand and gravel leases and deposit such payments in interest-bearing trust accounts. By failing to reasonably manage the collection of lease payments, the Government deprived the Tribes of not only trust principal, but also the interest that would have been generated

on that principal had the Government not breached its fiduciary responsibilities. This decision therefore does not award pre-judgment interest, but rather awards interest as a part of the damages sustained by the Government's breach. *See Short v. United States,* 50 F.3d 994, 999–1000 (Fed.Cir.1995). Under the analysis set forth by the dissent, if the Government failed to collect any payments despite being under an obligation to do so, the Government would experience no liability whatsoever for lost interest. If the Government mismanaged principal, however, it would be liable for interest. Such a distinction is untenable; it would perversely (and proportionally) reward the Government for inaction that violates the Government's fiduciary duties to collect funds and accrue interest.

sell tribal lands at public auctions and accrue interest on the proceeds for the benefit of the tribe. 390 U.S. 468, 469, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). The Government sold tribal lands at private sales instead, resulting in lower prices received for the property. *Id.* The Court of Claims and the Indian Claims Commission denied the tribe damages for the failure to invest the proceeds that "would have been received had the United States not violated the treaty." *Id.* at 473, 88 S.Ct. 1137. The Supreme Court reversed, holding that the Government had an obligation to invest the money that should have, but was not, collected from the sale of land. *Id.* at 472–73, 88 S.Ct. 1137. Accordingly, the Supreme Court held that the Government was required to pay interest on the potential, rather than actual, proceeds of the sales as part of the damages for breach of the treaty. *Id.* at 470, 88 S.Ct. 1137; *see also United States v. Blackfeather,* 155 U.S. 180, 193, 15 S.Ct. 64, 39 L.Ed. 114 (1894) (permitting interest to be paid on amounts that should have been, but were not, collected upon the sale of the tribes' lands).

*Peoria Tribe* is directly on point. The Government has a binding obligation to collect revenues from the sand and gravel contracts and earn interest on the revenues derived. *See* 25 U.S.C. § 612.[8] On the basis of *Peoria Tribe,* damages are therefore due to the Tribes for the failure to invest proceeds that "would have been received had the United States not violated" its fiduciary obligation to collect amounts due under the sand and gravel leases. *Peoria Tribe,* 390 U.S. at 473, 88 S.Ct. 1137.

We also find merit in the Tribes' argument that the general provisions for tribal trust management and interest accrual found in 25 U.S.C. §§ 161a, 161b, and 162a mandate the payment of interest. When considered in conjunction with the Government's fiduciary duty to collect revenue from mineral leases under regulations implementing the IMLA, these trust fund statutes create an obligation for the Government to pay interest on amounts that the Government failed to collect. IMLA, 52 Stat. 347, 25 U.S.C. § 396 *et seq.* (2000); 25 C.F.R. § 211.40.

This court has previously held that 25 U.S.C. §§ 161a, 161b, and 162a mandate the payment of interest under certain circumstances. In *Short v. United States,* the Government held in trust profits generated from the sale of certain natural resources on the Hoopa Valley Reservation and therefore had an obligation to accrue interest on those amounts according to 25 U.S.C. §§ 161a, 161b, and 162a. 50 F.3d at 999–1000. The Government wrongfully disbursed certain funds to one tribe on the reservation to the detriment of the other tribe coexisting on the reservation. Relying on *Peoria Tribe,* the Court granted interest based on 25 U.S.C. §§ 161a, 161b, and 162a, not as an award on damages, but "as part of the damages award itself." *Id.*

Under *Short* and *Peoria Tribe,* when the Government has a clear statutory fiduciary duty to collect or manage funds and further undertakes the duty to earn interest on those funds, the failure of the Government to collect or manage such funds in accordance with its obligations will result in an award of damages for that

---

8. As discussed in Part II.B.2, the Government did not have a trust responsibility to obtain the best possible market rates for the sand and gravel contracts. It therefore is obvious that the Tribes cannot recover interest on the amounts that the Tribes did not receive because of the Government's alleged failure to obtain the maximum price for the sand and gravel assets.

failure and an award of interest on the amount mismanaged or not collected. As was the case in *Short* and *Peoria Tribe,* the Government here has a separate and distinct statutory fiduciary. obligation to pay the interest on. the funds it failed to collect or otherwise mismanaged.

The Government argues that reliance on *Short* would conflict with the Court of Claims decision in *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265 (1981).. That decision, which led to the Supreme Court decision in *Mitchell II,* is also binding on this court. In *Mitchell,* the Court of Claims held that the mismanagement of timberlands by the United States would give rise to a damages award, but not to an award of interest on monies that plaintiffs might recover for the mismanagement of trust assets. In its decision, however, the court did not discuss or reconcile its decision with the binding Supreme Court precedent of *Peoria Tribe.* In affirming the Court of Claims' decision, the Supreme Court in *Mitchell II* also did not address the denial of interest.

In any event, the present case is distinguishable from *Mitchell.* The Tribes point to a definitive requirement[9] that the Government credit its trust accounts with its sand and gravel proceeds and earn interest on those trust funds. *See* 25 U.S.C. § 612; *see also* 25 C.F.R. § 211.40; 25 U.S.C. §§ 161a, 161b, and 162a. In *Mitchell,* however, the Government's duties arose from a network of statutes relating to timber management, none of which required the Government to deposit the proceeds into an interest-bearing tribal trust account. *See* 25 U.S.C. § 406 (providing that payment for timber sales should be made to the owner of the land or disposed of for their benefit); 25 U.S.C. § 407 (providing that timber sale proceeds from unallotted lands should be dispersed "as determined by the governing bodies of the tribes concerned and approved by the Secretary"); 25 U.S.C. §§ 323–325 (providing that compensation received for rights of way should be disposed of in accordance with enacted regulations of the Secretary, which in turn provide that the consideration be paid to the landowner under 25 C.F.R. § 169.14 (2003)).[10] Unlike *Short* or *Peoria Tribe,* the Government in *Mitchell* never placed the proceeds into a trust to earn interest (*Short* ) or even had the obligation to do so (*Peoria Tribe* ).

In light of *Peoria Tribe* and the statutory language of 25 U.S.C. § 612, we hold that the Tribes are entitled to interest on monies that the Government was contractually obligated to collect, but did not collect or delayed in collecting, on behalf of the Tribes. We further hold that the same interest obligation arose under the Government's duty to collect mineral royalties pursuant to 25 C.F.R. § 211.40 and to pay interest on such royalties pursuant to the general trust management statutes of 25 U.S.C. §§ 161a, 161b, and 162a.

## III. CONCLUSION

We hold that the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108–7, suspends the statute of limitations for certain trust claims until an accounting of the trust is received. The claims covered by the Act include claims relating to the Government's mismanagement of tribal trust

---

**9.** A general requirement to deposit miscellaneous funds in trusts, such as 25 U.S.C. § 155, would be unlikely to fulfill the standards required in *Mitchell II.*

**10.** Other statutes listed in *Mitchell* do not involve the sale or leasing of tribal assets. 25 U.S.C. § 466 (requiring sustainable yield harvesting); 25 U.S.C. § 318a (authorizing the appropriation of money for reservation roads).

funds after funds are deposited in trust and claims relating to the Government's failure to timely collect amounts due and owing to the Tribes under its sand and gravel contracts.

We further hold that the Tribes are entitled to interest on amounts that the Government was contractually obligated to collect, but did not collect or delayed in collecting on behalf of the Tribes under both 25 U.S.C. § 612 and the combination of 25 C.F.R. § 211.40 and 25 U.S.C. §§ 161a, 161b, and 162a. We remand for further proceedings consistent with this opinion. Based on the foregoing, we

*AFFIRM–IN–PART, REVERSE–IN–PART, AND REMAND.*

## IV. COSTS

No costs.

RADER, Circuit Judge, dissenting-in-part.

Although I agree with the court on the statute of limitations and the liability for mismanagement of trust funds but not assets, I respectfully disagree with its construction of 25 U.S.C. § 612. As a general proposition, 28 U.S.C. § 2516 relieves the United States of any liability for prejudgment interest, except where Congress has expressly authorized that payment. *See Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("The consent necessary to waive the traditional immunity [against liability for prejudgment interest] must be express, and it must be strictly construed.") (quoting *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947)). Section 612, to my eyes, does not expressly authorize awarding prejudgment interest as a part of the damages.

That section places "all revenues and receipts derived from the Wind River Reservation under any and all laws" in a trust account where interest would accrue on the principal at four percent per year. *See* 25 U.S.C. § 612. Section 612 thus makes the United States responsible only for interest on funds actually collected and deposited in the trust account. This language does not obligate interest on funds that the United States should have collected or should have deposited. Accordingly, I do not read § 612 to overcome the general proscription against prejudgment interest.

For the same reason, the Court of Claims' en banc decision in *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265 (1981), *aff'd*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), governs this case. In *Mitchell II*, the court read Indian trust fund statutes of general applicability—25 U.S.C. §§ 161a, 161b, and 162 (similar in many respects to § 612)—to deny the Indian tribes interest on claims stemming from mismanagement of trust assets. The court stated unequivocally that the tribes "are not entitled, however, to such interest on any unpaid amounts they may now recover in the present suit.... Those [unpaid] sums or their equivalent were never held by the Government for plaintiffs, were not subject to the specific interest provisions ... and there is no statute awarding back-interest on such unpaid compensation now awarded by the court in this suit." *Mitchell II*, 664 F.2d at 275. Accordingly, the *Mitchell II* court denied those tribes, very similarly situated to the tribes in this case, interest on uncollected funds.

The court today distinguishes *Mitchell II* because it reads § 612 to create a definitive requirement that the United States deposit proceeds in an interest-bearing trust. The court observes that *Mitchell II* evinces no requirement to deposit proceeds into an interest-bearing account. To the contrary, *Mitchell II* makes clear that

"tribal trust funds and proceeds of the sale of Indian lands must be held in the Treasury at interest under 25 U.S.C. §§ 161a and 161b (1976), but an alternative under § 162a is deposit in banks" and that the United States "must as trustee exercise reasonable management zeal to get for the Indians the best rate, the statutory 4% being but a floor, not a ceiling." *Mitchell II*, 664 F.2d at 274. Thus, the statutes in *Mitchell II*, like section 612 in this case, required deposit and interest on the trust proceeds. On such compellingly similar facts, *Mitchell II* governs this case.

Moreover, *Peoria Tribe of Indians of Oklahoma v. United States*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), does not change the holding in *Mitchell II*. The Supreme Court in *Peoria Tribe* awarded interest on damages for malfeasance because the United States violated a treaty by selling some of the land ceded by the Indians to the United States "not by public auction, but by private sales at appraised prices lower than would have prevailed at public auction." *Peoria Tribe*, 390 U.S. at 469–70, 88 S.Ct. 1137. *Peoria Tribe* thus remedies the breach of a very specific duty, not negligence in general administration of a trust. In this case, on the other hand, the United States' liability stems from nonfeasance or negligence.

Similarly, *Short v. United States*, 50 F.3d 994 (Fed.Cir.1995), does not (and could not) override the holding of *Mitchell II*. In *Short*, this court held the government liable for interest on funds actually held but wrongfully disbursed. That, like *Peoria*, is malfeasance. In this case, the United States never collected the monies and, thus, never placed them in any account to bear interest. Accordingly, *Short* does not apply. Indeed, the proper reconciliation of the binding precedent of *Short* and *Mitchell II* yields the following: If funds are wrongfully disbursed after deposit, the United States is liable for interest on the missing funds. But if funds have not been collected and deposited in a trust account even due to negligence, the United States is *not* liable for interest on the missing funds. Accordingly, the United States should not be liable for prejudgment interest in the present case.